HOMER A. BONHIVER, RECEIVER OF AMERICAN
ALLIED INSURANCE COMPANY, v. PHILIP H.
GRAFF AND OTHERS.
FRANK J. DELMONT AGENCY, INC.,
AND ANOTHER, INTERVENORS.

248 N. W. 2d 291.

November 19, 1976—No. 45493.

112

*Altman, Geraghty, Mulally & Weis, James Geraghty, Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, O. C. Adamson II,* and *Robert M. Frisbee,* for appellants.

*Collins & Buckley* and *Theodore J. Collins,* for respondent plaintiff.

*Cochrane & Bresnahan, John A. Cochrane, Magistad & Noonan,* and *Stewart C. Loper,* for respondent intervenors.

Heard before Sheran, C. J., and MacLaughlin, Yetka, Scott, and Breunig, JJ., and reconsidered and decided by the court en banc.

SHERAN, CHIEF JUSTICE.

This is another case arising out of the 1965 collapse of American Allied Insurance Company. Two other lawsuits having the same origin have reached this court: Magnusson v. American Allied Ins. Co. 282 Minn. 287, 164 N. W. 2d 867 (1969); Magnusson v. American Allied Ins. Co. 290 Minn. 465, 189 N. W. 2d 28 (1971). Other courts have also faced issues arising out of the collapse.[1]

The facts relevant to this appeal are as follows: Defendant Schwartz, Frumm & Company (hereafter Schwartz, Frumm) is a firm of certified public accountants with its office in Chicago, Illinois. Defendant Philip Graff, a duly certified public accountant, worked for Schwartz, Frumm from November 1960 to December 1964.

Prior to 1963, members and employees of Schwartz, Frumm

---

[1] See, e. g., Magnusson v. American Allied Ins. Co. 286 F. Supp. 573 (D. Minn. 1968); Bonhiver v. State Bank of Clearing, 29 Ill. App. 3d 794, 331 N. E. 2d 390 (1975).

had done some accounting work for Phillip Kitzer, Sr., with respect to a garage owned by him, and with respect to Adequate Mutual Insurance Company (Adequate Mutual). The firm corrected for refiling the annual "convention statement" submitted by Adequate Mutual for the year 1961 or 1962. As originally filed, the statement was unacceptable to the Illinois Department of Insurance. In May 1963, at the request of Kitzer, Sr., and Phillip Kitzer, Jr., Leonard Frumm and an employee, James Holly, journeyed from Chicago to Minneapolis to inspect the books of American Allied Mutual Insurance Company (American Allied Mutual). The Kitzers were interested in purchasing American Allied Mutual for $100,000. Frumm and Holly spent about 10 hours inspecting American Allied Mutual's books, and reported to Kitzer, Sr., that American Allied Mutual was impaired. Frumm and Holly recommended to the Kitzers that they not purchase the company for the price requested, but they purchased it anyway for $20,000.

Upon purchasing American Allied Mutual, the Kitzers transferred its assets and liabilities to a newly formed stock company —American Allied Insurance Company (American Allied). Schwartz, Frumm employees assisted the Kitzers in connection with this acquisition. All of the stock of American Allied was owned by the Kitzers. A subsidiary of American Allied was set up—Allied Realty Company. All of the stock of Allied Realty was ultimately owned by American Allied. The name of American Allied Mutual was changed to United States Mutual Insurance Company (United States Mutual) and a majority of its guaranty fund certificates were owned by Allied Realty. A stock company, Bell Casualty Insurance Company (Bell Casualty), was established and its stock was owned by Allied Realty, as was Bell Mutual Insurance Company (Bell Mutual). In 1965, the Kitzers bought the Phalen Park State Bank. The stock in the bank was transferred 1/3 to American Allied, 1/3 to Allied Realty, and 1/3 to United States Mutual. Thus, the Kitzers owned American Allied; American Allied in turn owned Allied Realty;

Allied Realty in turn owned United States Mutual, Bell Mutual, and Bell Casualty. The Phalen Park State Bank was owned 1/3 by United States Mutual (which in turn was owned by Allied Realty, which was itself owned by American Allied), 1/3 by Allied Realty (which was in turn owned by American Allied), and 1/3 by American Allied directly.

In November 1963, Holly left Schwartz, Frumm to become a vice president of American Allied. In August 1964, Holly contacted Frumm and requested help in getting American Allied's books up to date as of June 30, 1964. Frumm sent Graff to St. Paul to do the work. Graff made various entries in the books and records of American Allied and prepared workpapers in the course of his work. On October 5, 1964, the commissioner of insurance of the state of Minnesota sent a team of examiners to examine the books of American Allied. Those examiners worked in the same room with Graff, examined his workpapers, and relied upon the entries he had made in the books, a standard practice. Graff at times personally furnished information to the examiners, and testified that he considered his work to be the "starting point" for the examiners. By his examiners' reliance upon Graff's entries, the commissioner was led to believe that American Allied was solvent, when in fact the company was insolvent. Had the examination disclosed that the company was insolvent, its continued operation would have been challenged by the commissioner. See, Minn. St. 1965, §§ 60.08; 60.12; 60.13; 60.19; 60.875, subds. 3, 6, 23, 39. Cf. Minn. St. 60A.031, subd. 5; 60A.051, subd. 5; 60A.07, subd. 5e; 60A.25; 60B.15; 60B.20.

Because a number of Graff's entries were erroneous, the examination did not disclose American Allied's insolvency. During the existence of American Allied, the Kitzers embezzled over $2,000,000 from the company. Graff's errors involved his failure to investigate and discover the true nature of a number of transactions by which this fraud was taking place. Those errors, upon which the defendants' liability was established,

were described in detail in the trial court's findings.[2] Basically, they involved transactions between two companies wherein a payment would be recorded in one manner on American Allied's books and in a different manner on the books of the other party to the transaction. The books of the other parties—often related companies such as Bell Mutual, Bell Casualty, or United States Mutual—were readily available to Graff. The court found that his failure to examine those books was negligence.

In the spring of 1965, rumors began circulating that American Allied was insolvent. The commissioner of insurance, at a meeting with several concerned parties, including Frank J. Delmont, intervenor,[3] gave assurances that American Allied was solvent. In reliance upon those assurances, Delmont, an insurance agent who had become a general agent of American Allied, continued to write insurance with American Allied. American Allied was allowed to continue to do business until June 10, 1965. During the period September 1964 to August 1965, the Kitzers withdrew $849,078.60 in cash.

Bonhiver instituted this action in October 1970. Delmont instituted a class action in Federal court on December 31, 1970. He intervened in this action on behalf of the class on March 5, 1974. After a court trial, Bonhiver was awarded damages of $88,-350.94, Delmont was awarded damages of $29,000, and the class action was dismissed. The trial court denied plaintiff's posttrial motion for amended findings or a new trial on the issue of damages, and also denied defendants' and intervenors' motions for amended findings. Defendants appealed and the other parties filed notices of review. We affirm.

■ The limitation period on bringing this action is 6 years. Minn. St. 541.05(5). That period commences to run when "the cause of action accrues." Minn. St. 541.01. As we have

---

[2] The relevant findings are attached hereto as an Appendix.

[3] Frank J. Delmont Agency, Inc., is also an intervenor. We will refer to both intervenors as Delmont unless the context requires other designation.

interpreted the rule, the action accrues "at such time as it could be brought in a court of law without dismissal for failure to state a claim." Dalton v. Dow Chemical Co. 280 Minn. 147, 153, 158 N. W. 2d 580, 584 (1968). "Until damage is occasioned, the right of action does not accrue, nor the time of limitation commence to run." Thornton v. Turner, 11 Minn. 237, 240 (336, 340) (1866). In the case at bar, plaintiff Bonhiver's suit is based upon damage sustained by American Allied as a result of misappropriation by the Kitzers which was allowed to continue because of defendants' negligence.

Defendant Graff left the employ of Schwartz, Frumm November 5, 1964. The last act of negligence chargeable to Schwartz, Frumm occurred either by that date or at some other time in November 1964. The Kitzers were withdrawing money continuously during this period. Thus, as of some time in November 1964, the company's cause of action against Schwartz, Frumm had accrued: All of the negligent acts chargeable to Schwartz, Frumm had been committed and damage to American Allied had occurred.

A civil action is commenced against each defendant when the summons is served upon him or is delivered to the proper officer for service. Rule 3.01, Rules of Civil Procedure. Minn. St. 540.152 provides that service upon the secretary of state shall have the same effect as service upon a nonresident association doing business within the state and causing injury within the state. Schwartz, Frumm is such a nonresident association. The requirements of Minn. St. 540.152 were complied with on October 16, 1970. The action was thus commenced by Bonhiver against Schwartz, Frumm within the 6-year period of the statute of limitations. Service was made on Graff on October 27, 1970, also within 6 years of the alleged acts of negligence.

Delmont intervened in this action on March 5, 1974. But he had originally filed suit in Federal court on December 31, 1970. His damages included loss of good will, loss of earnings, and loss of premiums paid. These damages were not sustained until after

118

the American Allied collapse in the summer of 1965, consequently his cause of action did not arise until then. His institution of the action in December 1970 was thus timely.

■ Defendants claim that Bonhiver, as receiver for American Allied, cannot maintain this action, as defendants are charged simply with failing to discover the fraud committed by the company's own officers. Whether or not the company would be precluded from bringing this suit (the company was the victim of the fraud, and not the perpetrator), "[t]he receiver represents the rights of creditors and is not bound by the fraudulent acts of a former officer of the corporation." Magnusson v. American Allied Ins. Co. 290 Minn. 465, 473, 189 N. W. 2d 28, 33 (1971). See, also, German-Am. Finance Corp. v. Merchants & Mfrs. State Bank, 177 Minn. 529, 225 N. W. 891, 64 A. L. R. 582 (1929). Bonhiver is thus not barred from bringing this action.

■ Plaintiffs' cause of action is not barred by intervening negligence. In this regard, the trial judge wrote:

"* * * Subordinates of the state Commissioner of Insurance were suspicious of the reports and statements and implored the Commissioner to take drastic action long before he did. Nevertheless, the Commissioner steadfastly held to the opinion that the American Allied Insurance Company was not insolvent as late as March of 1965. The fact that the Commissioner did not heed the advice of his subordinates does not negate or lessen the negligence of the defendants in departing from their standards of care. It is unfortunate that the Commissioner did not accept the advice of his subordinates. Regrettably, he called a conference in March of 1965, consisting of insurance agents and many others, who did business with American Allied Insurance Company, to assure them that the Company was solvent, and that the rumors circulating to the contrary were false. That foolhardiness or stupidity does not mitigate in favor of the defendants."

In Minnesota intervening negligence, to be a superseding ef-

ficient cause, must be "in no way caused by defendant's negligence." Medved v. Doolittle, 220 Minn. 352, 357, 19 N. W. 2d 788, 791 (1945). Here, the commissioner's steadfast belief that American Allied was solvent was caused by defendants' negligence. It was their entries which led to the appearance of solvency and upon which the commissioner relied. Thus, the commissioner's negligence was, at most, concurrent but not intervening.

■ Two expert witnesses were called by plaintiff, Howard M. Guthmann, a certified public accountant and president-elect of the Minnesota Society of Certified Public Accountants, and Richard D. Thorsen, a certified public accountant, past president of the Minnesota Society of Certified Public Accountants, and past chairman of the State Board of Accountancy. Both witnesses, upon hypothetical questions, stated that the defendants did not use the ordinary and reasonable standard of care exercised by the ordinary, careful certified public accountant. The only expert witnesses to testify to the contrary were defendants themselves. There is, therefore, sufficient evidence to sustain the trial court's finding that defendants' actions were negligent.

■ Defendants dispute liability because they did not produce a complete, certified set of financial statements, but only a set of unaudited workpapers which were themselves incomplete.

Schwartz, Frumm was never asked to produce complete financial statements. It was engaged to bring American Allied's books up to date, a job which was never, in fact, completed.

All accountant malpractice cases called to our attention have involved accountants who prepare or certify completed financial statements. See, e. g., Rusch Factors, Inc. v. Levin, 284 F. Supp. 85 (D. R. I. 1968); Ryan v. Kanne, 170 N. W. 2d 395 (Iowa 1969); Shatterproof Glass Corp. v. James, 466 S. W. 2d 873 (Tex. Civ. App. 1971); Hochfelder v. Ernst & Ernst, 503 F. 2d 1100 (7 Cir. 1974), reversed, 425 U. S. 185, 96 S. Ct. 1375, 47 L. ed. 2d 668 (1976). No case cited by the parties passes

on the liability of a certified public accountant when his work product is not a completed financial statement but is rather a set of unfinished workpapers and adjusting entries. Only one case passes on the liability of a certified public accountant with respect to an "unaudited" financial statement.

In United States v. Natelli, 527 F. 2d 311 (2 Cir. 1975), the defendant accountants were convicted of making materially false statements in proxy statements filed with the Securities and Exchange Commission. Such a proxy statement required an unaudited 9-month statement of earnings to be attached. This statement turned out to be false, and the court discussed the defendant's liability with respect to it, stating:

"Natelli contends that he had no duty to verify the Eastern 'commitment' because the earnings statement within which it was included was 'unaudited.'

"This raises the issue of the duty of the CPA in relation to an unaudited financial statement contained within a proxy statement where the figures are reviewed and to some extent supplied by the auditors. It is common ground that the auditors were 'associated' with the statement and were required to object to anything they actually 'knew' to be materially false. In the ordinary case involving an unaudited statement, the auditor would not be chargeable simply because he failed to discover the invalidity of booked accounts receivable, inasmuch as he had not undertaken an audit with verification. In this case, however, Natelli 'knew' the history of post-period bookings and the dismal consequences later discovered. Was he under a duty in these circumstances to object or to go beyond the usual scope of an accountant's review and insist upon some independent verification? The American Institute of Certified Public Accountants, Statement of Auditing Standards No. 1—Codification of Auditing Standards and Procedures (1972), 1 CCH AICPA Professional Standards § 516.00, recognizes that 'if the certified public accountant concludes in the basis of facts known to him that unaudited financial statements with which he may become as-

sociated are not in conformity with generally accepted accounting principles, *which include adequate disclosure,* he should insist * * * upon appropriate revision * * *' (emphasis added).

"We do not think this means, in terms of professional standards, that the accountant may shut his eyes in reckless disregard of his knowledge that highly suspicious figures, known to him to be suspicious, were being included in the unaudited earnings figures with which he was 'associated' in the proxy statement." 527 F. 2d 320.

We note that in Natelli the court was concerned with the level or degree of a breach of duty which is sufficient to subject an accountant to criminal penalties. To establish liability for negligence in the case at bar, plaintiff and the intervenors need only show a breach of the ordinary standard of care.

Natelli passed upon liability for an unaudited, but completed, financial statement. While no reported case has passed on the liability of an accountant for malpractice in producing workpapers and adjusting entries, it is our opinion that such liability must be imposed upon the defendants on the facts of this case.

This case is a most unusual one. Schwartz, Frumm had investigated American Allied Mutual in 1963 and found that it was impaired. This alerted them to the fact that they were dealing with a "sick cat." Then, in October 1964 Graff personally showed his workpapers and adjusting entries to the state examiners, and he knew that they were relying upon them in conducting their statutorily required examination of American Allied. This was a representation that the assets indicated by those entries were owned by American Allied and could be counted by the commissioner in his examination. The defendants' actual knowledge that the commissioner was relying upon these representations renders them liable for their negligence in making them.

Restatement, Torts 2d, Tent. Draft No. 12, § 552 provides as follows:

"§ 552 Information Negligently Supplied for The Guidance of Others.

"(1)   One who, in the course of his business, profession or employment, or in a transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

"(2)   Except as stated in subsection (3), the liability stated in subsection (1) is limited to loss suffered

"(a)   By the person or one of the persons for whose benefit and guidance he intends to supply the information, or knows that the recipient intends to supply it; and

"(b)   Through reliance upon it in a transaction which he intends the information to influence, or knows that the recipient so intends, or in a substantially similar transaction.

"(3)   The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them."

The actions of the defendants fall within the above section. With respect to subsection (1), it is clear that defendants, in the course of their business, supplied false information to American Allied and the commissioner of insurance, that those parties justifiably relied upon the information, and that defendants failed to exercise reasonable care or competence in communicating it. With respect to subsection (2)(a), the defendants supplied the information to both American Allied and the commissioner; with respect to subsection (2)(b), these parties relied upon it in determining whether the operation of American Allied could continue. Because of the continued operation, American Allied suffered an additional loss of $849,078.60 to the Kitzers.

The fact that no previous accounting malpractice case deals

with liability for erroneous workpapers or adjusting entries does not unduly concern us, for in the normal case no representations are made by use of such work product; rather, the accountants prepare complete financial statements from their workpapers and distribute the completed statements. The workpapers remain the property of the accounting firm and not of the client. In this case, however, the defendants personally displayed their workpapers to the state examiners and knew that the examiners were relying upon them.[4]

Defendants not only had actual knowledge of the fact that representations were being made by use of the workpapers and adjusting entries, but they made those representations themselves—by personally handing over the workpapers and adjusting entries.

On the facts of this case, therefore, we hold that defendants can be held liable for negligent misrepresentation even though they had not produced an audited or completed financial statement.

■ Delmont initiated their action in Federal court as a class action on behalf of—

"* * * all those persons, firms or corporations howsoever engaged as insurance agents, brokers or producers of insurance contracts who were licensed by the State of Minnesota as agents or brokers who produced contracts for insurance that were placed with American Allied Insurance Company and related companies during all material times alleged in this Complaint and who have sustained damages as a result of the negligent acts of the defendants and/or each of them as herein alleged."

This class encompasses 984 agents. On October 31, 1973,

---

[4] This is not a case where, unbeknown to defendants, American Allied employees displayed defendants' uncompleted workpapers to the examiners. In such a case, if such a display is not normally made, perhaps the accountants should not be held liable, as they would have had no idea that any representation would be made to anyone through the use of those papers or that anyone would be relying upon them.

124

Judge Philip Neville certified the action as a class action. On March 5, 1974, Delmont, individually and as a representative of the class, was allowed to intervene in the instant action.

In order to maintain the type of Federal class action brought by Delmont, each individual member of the class must have a claim of at least $10,000. Zahn v. International Paper Co. 414 U. S. 291, 94 S. Ct. 505, 38 L. ed. 2d 511 (1973). Any plaintiff who does not have $10,000 in controversy must be dismissed from the action, as the Federal court does not have subject-matter jurisdiction over that party's claim. Only Delmont had a claim for $10,000 or more. Because the Federal court never had obtained jurisdiction over the members of the class other than Delmont, the trial court determined that the class action was not brought within the period of the statute of limitations.[5] Thus, because the statute had run as to the members of the class other than Delmont, the class action could not be maintained. Delmont's claim could be maintained, however, as he had brought it in a court of competent jurisdiction before the expiration of the statutory period.

Intervenors argue that under American Pipe & Const. Co. v. Utah, 414 U. S. 538, 94 S. Ct. 756, 38 L. ed. 2d 713 (1974), the filing of the class action tolled the statute of limitations for all members of the class. In that case a class action was brought in a Federal district court of competent jurisdiction. Class-action status was then denied because the plaintiffs failed to demonstrate that the class was so numerous that joinder of all members was impracticable. The court held:

"* * * [W]here class action status has been denied *solely* because of failure to demonstrate that 'the class is so numerous that joinder of all members is impracticable,' the commencement of the original class suit tolls the running of the statute for all purported members of the class * * *. * * * *

\* \* \* \* \*

---

[5] The latest possible date that the statute could allow suit was August 9, 1971.

"* * * We are convinced that the rule most consistent with federal class action procedure must be that the commencement of a class action suspends the applicable statute of limitations *as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action.*" (Italics supplied.) 414 U. S. 552, 94 S. Ct. 766, 38 L. ed. 2d 726.

American Pipe thus does not control the decision in the case at bar. In that case the initial court had subject-matter jurisdiction, it simply declined to certify the class action because of a failure to prove numerosity.[6] In the case at bar, the Federal court did not have subject-matter jurisdiction, and no class member other than Delmont would have been a party had the suit been permitted to continue. As is stated in Wheeler, *Predismissal Notice and Statutes of Limitations in Federal Class Actions After American Pipe and Construction Co. v. Utah*, 48 So. Cal. L. Rev. 771, 782:

"* * * Thus, it will not suffice to be a member of the class alleged in the complaint. Rather, the statute of limitations will be tolled only for persons who would have been members of the class that would have been approved by the trial court had it allowed the action to be maintained as a class action."

---

[6] The Supreme Court pointed out that "the determination to disallow the class action was made upon considerations that may vary with such subtle factors as experience with prior similar litigation or the current status of a court's docket." American Pipe & Const. Co. 414 U. S. 538, 553, 94 S. Ct. 756, 766, 38 L. ed. 2d 713, 726.

In a footnote the court elaborated: "* * * Judge Pence based his conclusion that the number of potential members was not so large as to make joinder impracticable on inferences from his prior experience with similar antitrust litigation against the same defendants. Not only would a district court's estimate of the expected attrition among the class of plaintiffs be difficult for any individual plaintiff to predict, but other federal courts have indicted that subsequent attrition will not be considered as a factor affecting numerosity under Rule 23 (a) (1) when considered at the outset of the case." Ibid.

Intervenors were the only members of the class who would have been allowed to continue in the Federal action.

In the absence of a state saving statute, the commencement of an action in a Federal district court which lacks jurisdiction does not toll the statute of limitations. See, e. g., Ellis v. Lynch, 106 F. Supp. 100 (D. N. J. 1952) (failure to meet jurisdictional amount); Lillibridge v. Riley, 316 F. 2d 232 (5 Cir. 1963) (failure to meet diversity requirement); and Hudnall v. Kelly, 388 F. Supp. 1352 (N. D. Ga. 1975). Cf. Nix v. Spector Freight System, Inc. 62 N. J. Super. 213, 162 A. 2d 590 (1960). Minnesota has enacted no such statute. Thus, since under Zahn v. International Paper Co. 414 U. S. 291, 94 S. Ct. 505, 38 L. ed. 2d 511 (1973), the Federal district court lacked jurisdiction over all of the claims before it except Delmont's, the statute of limitations was not tolled by the filing of the class action except as to Delmont's claim.

■ No case passing on accountants' malpractice liability has considered their liability to agents of an insurance company client. Two distinct questions are presented: (1) Under what circumstances can accountants be held liable to third parties for negligent misrepresentation? (2) Do those circumstances exist here so as to render the defendants liable to Delmont, an American Allied agent? Delmont's claim is that he relied upon the representations of the commissioner of insurance, who in turn relied upon the representations of defendants. Thus, it is claimed that through this chain of reliance defendants are liable to Delmont.

In the oft-cited case of Ultramares Corp. v. Touche, 255 N. Y. 170, 174 N. E. 441 (1931), then Chief Judge Cardozo refused to hold accountants liable to third parties who relied upon financial statements prepared by the defendants when the defendants had prepared the statements primarily for the benefit of their client and only incidentally for the benefit of the third parties. He stated that, while the accountants would be liable

to third parties if the malpractice amounted to fraud, in the case of simple negligence the prospective liability was too great:

"* * * If liability for negligence exists, a thoughtless slip or blunder, the failure to detect a theft or forgery beneath the cover of deceptive entries, may expose accountants to a liability in an indeterminate amount for an indeterminate time to an indeterminate class. The hazards of a business conducted on these terms are so extreme as to enkindle doubt whether a flaw may not exist in the implication of a duty that exposes to these consequences." 255 N. Y. 179, 174 N. E. 444.

The rule of Ultramares has been weakened over time. See, Prosser, *Misrepresentation and Third Persons*, 19 Vand. L. Rev. 229; Comment, 53 Minn. L. Rev. 1375; Note, 52 Marquette L. Rev. 158. In Rusch Factors, Inc. v. Levin, 284 F. Supp. 85, 91 (D. R. I. 1968), the court proposed as a rule that accountants be held liable to all parties whose reliance upon the accountants' work product was reasonably foreseeable:

"* * * Why should an innocent reliant party be forced to carry the weighty burden of an accountant's professional malpractice? Isn't the risk of loss more easily distributed and fairly spread by imposing it on the accounting profession, which can pass the cost of insuring against the risk onto its customers, who can in turn pass the cost onto the entire consuming public? Finally, wouldn't a rule of foreseeability elevate the cautionary techniques of the accounting profession? For these reasons it appears to this Court that the decision in *Ultramares* constitutes an unwarranted inroad upon the principle that '[t]he risk reasonably to be perceived defines the duty to be obeyed.' Palsgraf v. Long Island R. R., 248 N. Y. 339, 344, 162 N. E. 99, 100, 59 A. L. R. 1253."

This was not the Rusch holding, however, as the court went on to hold that the plaintiff in that case was not a member of an undefined, unlimited class of remote lenders and potential equity

holders but a single party whose reliance was actually foreseen by the defendant.

The Rusch suggestion that an accountant's liability for negligent misrepresentation be extended to all those parties whose reliance upon the representation was reasonably foreseeable has drawn much criticism and has not been accepted by any court to date. For example, one commentator has stated: "The precise limit lies somewhere between a class composed of parties actually known by the accountant and one composed of all foreseeable parties." Comment, 53 Minn. L. Rev. 1375, 1384. What has been accepted is an extension of the accountant's liability to those who, although not themselves foreseen, are members of a limited class whose reliance on the representation is specifically foreseen. Hochfelder v. Ernst & Ernst, 503 F. 2d 1100, 1107 (7 Cir. 1974), reversed on other grounds, 425 U. S. 185, 96 S. Ct. 1375, 47 L. ed. 2d 668 (1976). See, Prosser, *Misrepresentation and Third Persons*, 19 Vand. L. Rev. 229. This is the position adopted by Restatement, Torts 2d, Tent. Draft No. 12, § 552.

This Restatement section, which has been discussed above, limits an accountant's liability in two ways. First, it is limited to loss suffered—

"(a) By the person or one of the persons for whose benefit and guidance he intends to supply the information, or knows that the recipient intends to supply it."

In the case at bar, the defendants were employed to bring American Allied's books up to date. In the course of their activities, they obtained actual knowledge that the examiners for the commissioner of insurance were relying upon the entries which they had made in American Allied's books. Their actual knowledge of the commissioner's reliance upon their representations brings the commissioner within that class of persons described in § 552(2) (a).

The second Restatement limitation is that liability for negligent misrepresentation is limited to loss suffered—

"(b) Through reliance upon it in a transaction which he intends the information to influence, or knows that the recipient so intends, or in a substantially similar transaction."

In the case at bar, the defendants knew that the commissioner was conducting his examination in order to determine whether American Allied was financially stable enough to be allowed to continue to do business in Minnesota. They knew that he was relying upon their work in making that determination. Thus, under the Restatement rule, defendants are liable to him for any loss he has suffered as a result of his reliance.

However, it would make little sense to speak of loss suffered by the commissioner. He has not been injured—he has no interest in the matter himself. Rather, he is a representative. The duties of the commissioner (set forth in Minn. St. c. 60A) to examine and monitor insurance companies which operate in this state are meant to provide protection to certain people who deal with these companies. Policyholders, for example, are not going to examine the books of the companies themselves; their "agent" in this matter is the commissioner. Thus, if they are injured because of reliance by the commissioner upon misrepresentations made by the defendants, and defendants are aware of that reliance, defendants' liability arguably should extend to the injured policyholders under § 552.

The question thus becomes: Is Delmont within that class of persons whose "agent" is the commissioner and who should be protected by the reliance of the commissioner? We believe that on the facts of this case he is within that group.

As is indicated above, the extent of an accountant's liability for malpractice is not settled. If that liability is to be drawn somewhere short of foreseeability,[7] it must be drawn on pragmatic grounds alone. Once it is admitted that a certain number of people have been injured as a result of an accountant's mal-

---

[7] Such a holding would appear to be in contravention to the rule that "[t]he risk reasonably to be perceived defines the duty to be obeyed." Palsgraf v. Long Island R. Co. 248 N. Y. 339, 344, 162 N. E. 99, 100.

practice, there is no logical justification for denying any of them relief based upon the "limited" or "unlimited" nature of their "class," or whether the reliance of the particular injured parties was or was not "specifically foreseeable." Distinctions based upon those factors are grounded in Mr. Justice Cardozo's fear that otherwise accountants would be exposed "to a liability in an indeterminate amount for an indeterminate time to an indeterminate class." Ultramares Corp. v. Touche, 255 N. Y. 170, 179, 174 N. E. 441, 444.

As the reporter for the Restatement has written:

"* * * In many situations the identity of the person for whose guidance the information is supplied is of no moment to the person who supplies it, although the number and character of the persons to be reached and influenced, and the nature and extent of the transaction for which guidance is furnished, may be vitally important. This is true because *the risk of liability to which the supplier subjects himself by undertaking to give the information,* while not affected by the identity of the person for whose guidance the information is given, *is vitally affected by the number and character of such persons, and the nature and extent of the proposed transaction.* On the other hand, the circumstances may occasionally show that the identity of the person for whose guidance the information is given is regarded by the person supplying it, and by the recipient, as important and material; and therefore the person supplying the information understands that his liability is to be restricted to the named person, and to him only." (Italics supplied.) Restatement, Torts 2d, Tent. Draft No. 12, p. 23.

Wherever the line will eventually be drawn between those who can recover from the negligent accountant and those who cannot, we feel that on the facts of this case Delmont falls on the side of those who can recover. Delmont was one of two general agents of American Allied. When rumors of American Allied collapse began to spread, Delmont suspended American Allied sales and Frank Delmont personally went to the commissioner in

order to determine the status of the company. When the commissioner reassured Delmont that American Allied was financially sound, he resumed sales. This personal reliance, indirect though it may be through the commissioner, was reasonable on the part of Delmont and sufficient to accord him protection against defendants' negligence.[8]

■ Bonhiver's proof of damages consists of the following: After August 31, 1964, the Kitzers withdrew $849,078.60 from American Allied. This embezzlement would have been prevented but for defendants' negligence. However, only $88,350.94 is needed to retire all unpaid claims. Thus, the company has been damaged to the extent of $88,350.94, and the award in that amount is reasonable.[9]

Delmont's damages consist of two elements:

(1) $19,000, an amount representing a judgment obtained against Delmont by Bonhiver in Ramsey County District Court to recover premiums owed American Allied by Delmont on American Allied policies written by Delmont. This amount should have been collected by Delmont from his policyholders. Delmont wrote the policies, owed American Allied its share of the premiums, and should have collected those premiums from Delmont's clients.

Delmont claims that he has been damaged in this amount because, following the collapse of American Allied, he was unable to collect these premiums from his customers. One response is that, if this is correct, it was not a result of any action of defendants. American Allied's collapse is not attributable to defendants, only the delay in discovering its insolvency is. If defend-

---

[8] Defendants' knowledge that the commissioner relied upon their work, in conjunction with Delmont's reliance upon the commissioner, distinguishes this case from Hochfelder v. Ernst & Ernst, 503 F. 2d 1100, 1107 (7 Cir. 1974), reversed on other grounds, 425 U. S. 185, 96 S. Ct. 1375, 47 L. ed. 2d 668 (1976).

[9] Because any excess would go to the Kitzers, who are the sole stockholders of American Allied, the $88,350.94 figure is the highest amount recoverable under the circumstances of this case.

132

ants had performed their duties properly in 1964, American Allied would have been placed in receivership at that time. Delmont would have been liable for the premiums he then owed American Allied, and he would have been just as unable to collect those premiums from his customers. The loss arises as a result of the policyholders' refusal to pay premiums after the collapse of the company. Such a refusal would have taken place even if defendants had performed their work properly; it simply would have taken place earlier. Delmont would have suffered this loss in just the same manner if American Allied had collapsed in 1964; he has not shown how the delay in appointing a receiver has had any effect at all on his loss in this area.

Although an award of damages will not be denied merely because of the difficulty of ascertaining them, the amount of damages must be established by the plaintiff and not left to speculation or conjecture. Miller v. Reiter, 155 Minn. 110, 192 N. W. 740 (1923). However, proof to an absolute certainty is not required. Austin v. Rosecke, 240 Minn. 321, 61 N. W. 2d 240 (1953). In Olson v. Naymark, 177 Minn. 383, 384, 225 N. W. 275 (1929), we stated:

"* * * Along the line from speculation to certainty there is a point not found by mathematical demonstration where it can be said that a jury or other fact-finding tribunal can give a safe judgment of the amount of damages flowing from a breach."

In the instant case, the argument that Delmont would have suffered this loss whether or not defendants had acted properly is quite persuasive. However, no evidence was produced at trial in support of such a contention. Rather, the evidence shows only that *Delmont sold certain policies after defendants did their work, that he was unable to collect premiums on those policies, and that he suffered a loss of $19,000 as a result.* On this record, for us to overturn that award on the belief, unsupported by evidence in the record, that Delmont would have suffered a similar loss even if the defendants had acted properly would be for us

to engage in speculation or conjecture. Perhaps there were no outstanding premiums at the earlier date, or perhaps those policyholders would have paid the premiums after the collapse. Although the result is troubling, on the record before us, the award must be affirmed.

(2) $10,000 an amount representing general damages for loss of business reputation. In the spring of 1965, rumors began to circulate that American Allied was insolvent. Delmont stopped writing American Allied policies for a few days, but, after being assured of the company's solvency by the commissioner of insurance, resumed writing them, assuring his customers that all was well. Then American Allied collapsed.

If American Allied had gone into receivership in 1964, Delmont's business would have suffered. However, the collapse would have been sudden and unanticipated and in all likelihood Delmont's customers would not have regarded their loss as his fault. But when the receivership was delayed, rumors began to circulate. Delmont's customers inquired about the stability of American Allied and he reassured them. He told them that he had checked with the commissioner and that all was well. In reliance upon his reassurances, his customers bought more American Allied insurance. Then came the crash. At this point, Delmont's customers would regard him as a man who could not be trusted; a man who, when they questioned him about the company, told them that all was well when it actually wasn't. This would not have happened had the company been placed in receivership in 1964. Thus, Delmont's business reputation undoubtedly was injured by the actions of defendants, and the award of general damages is affirmed.

■ Plaintiff and intervenors claim that they are entitled to interest on their claims from the date of their injuries. The trial court denied interest, and we agree.

In Moosbrugger v. McGraw-Edison Co. 284 Minn. 143, 160, 170 N. W. 2d 72, 82 (1969), we set down the general rule for the allowance of prejudgment interest as follows:

"The general rule in this state is to require interest in the case of a liquidated claim or a sum certain and not to allow interest in a case of an unliquidated claim because a defendant does not know how much he owes until the verdict is reached. However, Minnesota has adopted the position that where a claim is unliquidated but ascertainable by computation or reference to generally recognized standards such as market value and the claim does not depend upon any contingency, interest shall be allowed the same as for a liquidated claim. Grand Forks Lbr. Co. v. McClure Logging Co. 103 Minn. 471, 115 N. W. 406; Swanson v. Andrus, 83 Minn. 505, 86 N. W. 465; 5 Corbin, Contracts, § 1048."

In Potter v. Hartzell Propeller, Inc. 291 Minn. 513, 189 N. W. 2d 499 (1971), defendant Maxwell modified the propellers of plaintiff's airplane in order to improve their synchronization. A blade on one of the propellers later fractured during flight, causing the plane to crash. The jury found that Maxwell had performed his work negligently and that this negligence was the cause of plaintiff's loss. The trial court allowed the plaintiff interest on his loss from the date of the crash. In reversing, we held that after the crash there was no way in which Maxwell could have determined the amount of his liability and paid it, thus stopping the running of the interest. We stated:

"In determining whether a plaintiff is entitled to interest on the verdict, we have distinguished between liquidated and unliquidated claims, allowing interest in the case of unliquidated claims only where the damages were readily ascertainable by computation or reference to generally recognized standards such as market value and not where the amount of damages depended upon contingencies or upon jury discretion (as in actions for personal injury or injury to reputation). Moosbrugger v. McGraw-Edison Co. 284 Minn. 143, 170 N. W. (2d) 72; Employers Lia. Assur. Corp. v. Morse, 261 Minn. 259, 111 N. W. (2d) 620; Grand Forks Lbr. Co. v. McClure Logging Co. 103 Minn. 471, 115 N. W. 406; Swanson v. Andrus, 83 Minn. 505,

86 N. W. 465; Varco v. Chicago, M. & St. P. Ry. Co. 30 Minn. 18, 13 N. W. 921. The rationale for this distinction is that, although in both cases plaintiff actually suffers loss of use of his money from the date of the wrongful act for which loss he theoretically should be compensated, it would nevertheless be unreasonable to require defendant to compensate plaintiff for this loss where defendant could not have readily determined the amount of damages himself either by computation or reference to generally recognized standards such as market value. The underlying principle is that one who cannot ascertain the amount of damages for which he might be held liable cannot be expected to tender payment and thereby stop the running of interest.

* * * * *

"* * * The question is not whether the parties agreed on the amount of damages but whether defendant could have determined the amount of his potential liability from a generally recognized objective standard of measurement, such as readily ascertainable market value. We hold only that on this record defendant Maxwell could not have so readily ascertained the amount of damages as to permit an award of interest from the date of loss." 291 Minn. 518, 189 N. W. 2d 504.

Bonhiver's damages as receiver were determined to be that amount by which the balance due and owing on allowed claims against the receivership exceeded the assets of the receivership. Total allowed claims came to $1,862,486.58. The receiver was able to garner sufficient assets to retire all but $88,350.94 of this amount. Thus, his damages were set at $88,350.94. This figure could not be ascertained by the defendants until the total of allowed claims was determined and the receiver had determined in what amount those claims exceeded his assets. Indeed, if his assets had exceeded the allowed claims, there would have been no damage, as the sole shareholders of American Allied were the Kitzers—the wrongdoers. Since Bonhiver's damages were not ascertainable until judgment, no interest can be allowed.

136

Delmont's damages were set at $29,000. This amount consists of two elements. Nineteen thousand dollars represents the amount of a judgment obtained against Delmont by Bonhiver in district court and entered on October 5, 1970. Defendants could not ascertain this amount of damage until the judgment was entered. Also, since that judgment does not provide for interest to be paid by Delmont before the date it was entered, Delmont is not in a position to claim interest on that amount before he himself became liable on it—October 5, 1970. Ten thousand dollars represents general damages for injury to reputation. In Potter v. Hartzell Propeller, Inc. 291 Minn. 513, 518, 189 N. W. 2d 499, 504, we specifically referred to damages for injury to reputation as being nonascertainable prior to judgment. We are convinced, as was the trial judge, that Delmont's damages were also unascertainable prior to judgment, and no prejudgment interest can be allowed on them.

The judgment of the district court is affirmed in all respects. Affirmed.

MR. JUSTICE OTIS and MR. JUSTICE KELLY took no part in the consideration or decision of this case.

APPENDIX

The trial court found in part as follows:

"18. That the American Allied Insurance Company had a bank account in the Exchange National Bank of Chicago, records of deposits and withdrawals of which were recorded on two ledger sheets (Plaintiff Exhibits 12A and 12B), not kept in the regular bound ledger of American Allied Insurance Company or on their premises, not seen or heard of by representatives of the Insurance Commissioner of the State of Minnesota during the fall months of 1964, at which time they were conducting their examination, and not seen by the Receiver, Bonhiver, until produced at the trial in Bismarck, North Dakota, in 1967. That Graff had said ledger sheets in his possession from 1965 to 1967. Kenneth Bell, while employed by defendants Schwartz & Frumm,

had made some of the entries on said ledger sheets starting in 1964, disclosing the deposits and withdrawals of said bank account; that not until defendant Graff was on the premises of American Allied Insurance Company in 1964 was any entry concerning the activities of Plaintiff Exhibits 12A and 12B reflected in the company ledger, and then only to reflect a balance in the bank of $139.97. Graff also made an entry of surplus notes of $295,860.03, and with the bank balance of $139.97 would total $296,000, offset by an entry, 'premiums in the course of collection—reinsurance, assumed Bell Mutual, to reflect transactions occurring in bank account in Chicago from 10 8 63 to 8 31 64,' which offset amounts to $296,000; whereas the entries in Exhibits 12A and 12B actually show deposits of $891,701.71 and withdrawals in the sum of $891,561.74, of which $546,505.49 went to the Kitzers; that all of said entries of said Plaintiff Exhibits 12A and 12B should have been entered and/or kept in the bound ledger or journal of American Allied Insurance Company at the time they were, in fact, made by Kenneth Bell, or after having been made by Kenneth Bell and discovered by Defendant Graff, said entries then should have been made and/or kept in said journal or ledger by defendant Graff. That the failure to accurately record in detail all such transactions in the bound journal or ledger of American Allied Insurance Company by defendant Graff and the failure to disclose to the Commissioner of Insurance of the State of Minnesota the true facts concerning those entries that he was aware of, was a departure from the standards of care to be exercised by him, and which amounted to negligence on his part and which, in turn, amounted to negligence on the part of his employer, Schwartz & Frumm.

"19. That on or about November 5, 1964, James Holly, the vice president of American Allied Insurance Company, requested of defendants Schwartz & Frumm that they verify amounts owed United Benefit Fire Insurance Company of Omaha, Nebraska, under a reinsurance agreement; that pursuant to said request, defendants Schwartz & Frumm, during the month of November

1964, and more particularly after November 5, 1964, sent an employe, Kenneth Millman, now a partner of said defendants' firm, to verify said amounts owed to United Benefit by American Allied Insurance Company; that up to November 5, 1964, defendant Graff was at the premises of American Allied Insurance Company, and no attempt was made to verify amounts owed by comparison of the books of the two insurance companies; that had such verification been made it would have disclosed a claimed payment of $100,000 by United Benefit to American Allied Insurance Company had never been recorded as collected or received by American Allied Insurance Company, but which payment United Benefit took credit for as a payment to American Allied Insurance Company; that on the basis of what verification Millman made, Millman determined that American Allied Insurance Company owed United Benefit the sum of $58,489.36, a check for which had been delivered to defendants Schwartz & Frumm, and which amount was actually paid by check by American Allied Insurance Company to United Benefit, and which, in fact, was not due, and should not have been paid because of the fact that the $100,000 allegedly paid by United Benefit was not a true fact. Further investigation on the part of defendants or their agents would have disclosed that Kitzer, Jr., had received a note in the sum of $100,000 from Republic Casualty Company, a William Brickey controlled insurance company, signed by William Brickey on October 13, 1964, for which note Kitzer, Jr., arranged for the Plymouth Agency to issue him a check for $100,-000. Kitzer, in turn, endorsed the check to Republic Casualty Company who, in turn, endorsed it to American Allied Insurance Company to allegedly pay or satisfy the obligation of United Benefit to American Allied Insurance Company. United Benefit gave Brickey credit for payment of the $100,000 on his personal obligation. Kitzer then diverted the Plymouth check which should have been delivered to American Allied Insurance Company, to himself; that at all times and during all of said transactions, the check was valueless. The failure on the part of defend-

ants Schwartz & Frumm and its employes to adequately investigate the records of the two insurance companies, simultaneously (American Allied Insurance Company and United Benefit Fire Insurance Company), involving the balance due on reinsurance agreements, resulted in a wrongful and unearned payment of $58,489.36 to United Benefit, which failure further amounted to a departure from the standards expected of defendants and amounted to negligence on their part.

"20. That following the payment of the $58,489.36 by American Allied Insurance Company to United Benefit, described hereinabove in Finding 19, Kitzer, Jr., then took Republic Casualty Company's note, also described in Finding 19 above, to Allied Realty Company, for which he requested and obtained $100,000 worth of Allied Realty Company stock. He then took the Allied Realty Company stock to American Allied Insurance Company and received a credit by way of an alleged surplus note for the sum of $100,000 in the surplus note account. All of said transactions are recorded in defendant Graff's handwriting in his work papers and carried over into the ledger of American Allied Insurance Company, and which appears as one of the admitted assets in the convention statement as of December 31, 1964.

"21. That during the year 1964, and more particularly before April 1, 1964, Bell Casualty Insurance Company was reinsured under a contract with American Allied Insurance Company; that on or about April 1, 1964, Bell Casualty Insurance Company delivered a check to American Allied Insurance Company in the sum of $90,000 as payment under a reinsurance contract, recorded by defendant Graff as a payment on the contract; that on or about August 31, 1964, the Kitzers owed American Allied Insurance Company the sum of $90,000 for stock of American Allied Insurance Company previously issued to them, and carried on the books of American Allied Insurance Company as an account receivable from Kitzers; that defendant Graff as of August 31, 1964, reclassified the amount received from Bell Casualty Insurance Company by making an auditor's adjust-

ment, representing that the amount paid to American Allied Insurance Company by Bell Casualty Insurance Company was actually paid by Kitzer, Jr.; that at all times Bell Casualty Insurance Company recorded the amount ($90,000) as having been paid to American Allied Insurance Company on its reinsurance contract; that defendant Graff at that time had access to the books and records of Bell Casualty Insurance Company, which were then under the control of a former employe of defendants Schwartz & Frumm (Kenneth Bell); that defendant Graff had actually previously done work on the books of Bell Casualty Insurance Company; that had defendant Graff made an investigation of the books and records of both Bell Casualty Insurance Company and American Allied Insurance Company, simultaneously, concerning the item in question, and had further compared both sets of records, he would have discovered the discrepancy; that the failure of defendant Graff to make such comparative investigation amounted to a departure from the standards of care expected of him which, in turn, amounted to negligence on his part as well as on the part of his employer, Schwartz & Frumm.

"22. That because of the negligence of defendant Graff described in Finding 21, the $90,000 paid by Bell Casualty Insurance Company to American Allied Insurance Company was carried on the books of American Allied Insurance Company as an admitted asset when, in truth and in fact, it was not. It was, however, viewed by the Commissioner of Insurance of the State of Minnesota as an admitted asset as of August 31, 1964, and appears as an admitted asset in the convention settlement prepared by defendant Graff for the year 1964.

"23. That during the year 1964 there existed a reinsurance contract between Bell Mutual Casualty Insurance Company and American Allied Insurance Company; that on April 21, 1964, the Stuyvesant Insurance Company issued its check in the sum of $58,362.60, made payable to Bell Mutual, denoted on the books of Bell Mutual as a 'special check.' Bell Mutual endorsed the

check and gave it to the American Allied Insurance Company. The check was deposited in the Exchange National Bank of Chicago in the account of American Allied Insurance Company on April 27, 1964. On that same day a counter check was written by Phillip Kitzer, Sr., on the American Allied Insurance Company bank account at Exchange National Bank for the same amount ($58,362.60), payable to the Plymouth Agency. Defendant Graff made entries in the American Allied Insurance Company ledger as of August 31, 1964, indicating that the Stuyvesant check was returned to Bell Mutual because it had been erroneously deposited in the American Allied Insurance Company account in the Exchange National Bank. The records of Bell Mutual, however, showed that the sum of $58,367.60 was paid to American Allied Insurance Company and that Bell Mutual's liability to American Allied Insurance Company had been reduced by that amount. No such entry was made on the books of American Allied Insurance Company, and no credit given Bell Mutual for that amount. Kitzer's counter check was paid to Plymouth Agency to reduce or retire his personal obligation. Defendant Graff had access to books and records of both American Allied Insurance Company and Bell Mutual. Had he investigated both sets of books and made the ordinary accounts comparative analyses, he would have discovered the discrepancy. His failure amounted to a departure from the standard of care expected of him, which made him negligent and, in turn, imposed negligence upon his employer, defendants Schwartz & Frumm.

"24. That in the month of July 1964 U. S. Mutual Insurance Company sent a check in the sum of $100,000 to American Allied Insurance Company as advance payment on a reinsurance treaty to be negotiated. As of August 31, 1964, U. S. Mutual's records indicated it had taken credit for having paid that amount to American Allied Insurance Company and had a credit balance then existing of $100,000. Defendant Graff, as of August 3, 1964, recorded this payment in the records of American Allied Insurance Company as though the $100,000 had been returned to

U. S. Mutual, which, in turn, indicated American Allied Insurance Company owed nothing to U. S. Mutual. In truth and in fact, U. S. Mutual's check was deposited in the American Allied Insurance Company's account in the Exchange National Bank, and by counter check dated August 14, 1964, drawn by Kitzer, Sr., $100,000 was paid to Plymouth Agency which Kitzer owned and controlled. That the books and records of U. S. Mutual were readily available to defendant Graff and had he made a comparative examination with those of American Allied Insurance Company, he would have discovered the discrepancy, which amounted to a departure from the standard of care expected of him, amounting to negligence on his part and, in turn, imposing negligence on his employer Schwartz & Frumm.

"25. That during 1964, and as of August 31, 1964, defendant Graff personally recorded a number of withdrawals of cash to the Kitzers, totalled said withdrawals, and charged said withdrawals against surplus notes. Up to the time that he made such entries, defendant Graff had never seen a surplus note to support any of the withdrawal transactions, and that if any surplus notes existed, they were created subsequent to August of 1964. That because of payments made to Kitzers, there were, from time to time, overdrafts in the surplus notes account on the books of American Allied Insurance Company.

"26. That in the convention statement there appears an item in the admitted assets 'stocks amounting to $2,310,610.77.' Included in that amount were three stocks, Blue Ridge Industries, Inc., Secondary Recovery Oil, Inc., and Natural Resources Corp., which were carried on the books of Allied Realty Company as having a value of $509,500.00. Those stocks were not owned by the Kitzers or Allied Realty Company but were in fact rented by the Kitzers from Buffin & Co. of New York for an annual rental fee. Though listed as part of the value of Allied Realty Company stock as of December 31, 1964, the stock certificates were not issued or dated until February 6, 1965, were signed by the same officers in each issue involving different corporations,

and were all marked with what appears to be a restriction. After the 1964 convention report had been submitted to the Commissioner of Insurance of the State of Minnesota, more particularly March 23, 1965, the certificates were returned to Buffin & Co. Defendant Graff could not recall seeing the certificates before preparing the convention statement, or if he did, he merely gave them a glance. He further testified that he listed the stocks as assets because he was told to do so by the Kitzers. The failure to make further inquiry on the part of defendant Graff, in making these entries, amounted to a departure from the standard of care expected of him, amounting to negligence and which, in turn, imposed negligence on the part of his employer Schwartz & Frumm.

"27. That during 1964, and as of August 31, 1964, defendant Graff 'cleared' the suspense account of American Allied Insurance Company, reclassifying items which had been undesignated by prior entries in the books of American Allied Insurance Company; that a substantial sum, to-wit, $287,209.11, was charged to the surplus note account of the Kitzers without any such notes being then in existence or reviewed by defendant Graff; that such reclassification constituted the exercise of professional judgment by defendant Graff and that the 'clearing' of the suspense account, without adequate investigation and without conveying all the facts available to Graff to the representatives of the Commissioner of Insurance of the State of Minnesota was beneath the standard of care of the profession, and constituted negligence for which negligence defendants Graff and his employer, defendants Schwartz & Frumm, are responsible."