Lisa A. BROEK, trustee for the next-of-kin of Alan L. Uetz, decedent, Appellant,

v.

PARK NICOLLET HEALTH SERVICES, et al., Respondents.

No. C9–02–1611.

Court of Appeals of Minnesota.

May 6, 2003.

David F. Herr, Margaret A. Garvin, Maslon Edelman Borman & Brand, L.L.P., and James S. Reece, Zelle, Hofmann, Voelbel, Mason & Gette, L.L.P., Minneapolis, for appellant.

440

Katherine A. McBride, James F. Roegge, Meagher & Geer, P.L.L.P., Minneapolis, for respondents.

Considered and decided by LANSING, Presiding Judge, and STONEBURNER, Judge, and MINGE, Judge.

## OPINION

LANSING, Judge.

The district court determined that the medical-malpractice statute of limitations barred this wrongful-death action. Decedent's trustee appeals, contending that the statute of limitations does not begin to run until a cause of action accrues and that the cause of action did not accrue in 1993, when decedent received the allegedly negligent medical advice, but in 2000, when decedent first suffered injury. Because a cause of action cannot accrue until injury occurs, and because the record is undisputed that decedent sustained no injury arising from the alleged negligence until he collapsed in September 2000, we reverse and remand.

## FACTS

This case involves a dispute over whether the statute of limitations operates to bar a cause of action in a medical-malpractice, wrongful-death action brought by Lisa Broek, the trustee for and widow of Alan Uetz. Uetz died at age thirty-nine after suffering cardiac arrest while playing racquetball. As a teenager, Uetz had been diagnosed with a ventricle septal defect (VSD), an abnormal heart condition in which there is an opening or defect in the septum, the muscular wall separating the two ventricles of the heart. He was monitored for that condition by physicians at the University of Iowa, who placed no restrictions on his activities. In 1991, he had an echocardiogram in Iowa, which revealed that rather than VSD, he suffered from idiopathic hypertrophic subaortic stenosis (IHSS), a heart-muscle disease of unknown cause that is typically inherited.

Shortly after this diagnosis Uetz moved from Iowa to the Twin Cities where he was seen at Park Nicollet Medical Center. Uetz reported in a June 1992 visit to Park Nicollet that he had no chest pain or trouble breathing and that he had taken medication for about nine months but had stopped because it gave him severe heartburn. Two months later, Uetz saw Dr. Phillip Ranheim at Park Nicollet. Ranheim noted that Uetz had been treated with Lopressor, which Uetz could not tolerate because of stomach distress and pain. Ranheim reported that Uetz was very active, playing basketball, racquetball, jogging, walking, and exercising regularly two to three times a week without any cardiac symptoms. Ranheim recommended that Uetz receive screening laboratory studies and another echocardiogram to establish "a baseline."

Uetz had the echocardiogram on February 12, 1993. On February 19, Ranheim wrote to Uetz, stating that the echocardiogram was "really very satisfactory" and showed "nothing * * * alarming." Ranheim continued, "From this echocardiogram, I would not feel that you should restrict any of your activities." He recommended that Uetz return for blood tests, concluding, "We should see you every couple of years to make sure that everything stays stable. If you have problems and want to come in before that time, just give my office a call."

Uetz did not return to Dr. Ranheim, nor did he follow up with any other cardiologist. On September 5, 2000, while playing racquetball, Uetz suffered cardiac arrest. He died about three weeks later without regaining consciousness.

Uetz's widow, Lisa Broek, initiated this medical-malpractice, wrongful-death action on March 4, 2002. Park Nicollet and Ranheim moved for summary judgment, contending that the action was time-barred by the statute of limitations applicable to wrongful-death claims.

In opposition to the summary-judgment motion, Broek submitted an expert affidavit from Dr. Barry Maron, Director of the Hypertrophic Cardiomyopathy Center of the Minneapolis Heart Institute Foundation, stating Maron's opinion that, at the time Uetz was seen at Park Nicollet, it was known that "vigorous physical activity with hypertrophic cardiomyopathy [which includes the condition of IHSS] can trigger ventricular fibrillation and lead to sudden death, even when the condition is otherwise stable." Maron stated that based on his review of the medical records, his opinion to a reasonable degree of medical certainty was that Uetz suffered no injury or damage as a result of the alleged negligence (the advice that it was unnecessary to restrict physical activities) until his collapse on September 5, 2000.

After a hearing, the district court granted the motion for summary judgment, concluding that the medical opinion that no damage was suffered until September 5, 2000, was not determinative of the narrow legal issue. The court concluded that the cause of action arose at the time of the alleged failure to provide proper treatment, that the physician-patient relationship terminated in February 1993, and that evidence of termination of the physician-patient relationship provided a more compelling basis for determining the accrual of the action than an inference of continuing fault. This appeal followed.

## ISSUE

Whether the district court erred in determining that the wrongful-death action based on a medical-malpractice claim accrued at the conclusion of treatment instead of the time of injury?

## ANALYSIS

When we review a grant of summary judgment, we determine whether there are any genuine issues of material fact and whether the district court erred in its application of the law. *Wallin v. Letourneau*, 534 N.W.2d 712, 715 (Minn.1995); *see* Minn. R. Civ. P. 56.03 (setting forth district court standard for summary judgment). If the facts on which summary judgment is granted are undisputed, we review de novo whether the district court erred in applying the law to determine the accrual of the cause of action and the running of the statute of limitations. *Weeks v. Am. Family Mut. Ins. Co.*, 580 N.W.2d 24, 26 (Minn.1998).

In Minnesota, the statute of limitations for a wrongful-death action occurring as a result of medical malpractice begins to run at the same time as the limitation period for the decedent's medical-malpractice claim. *DeRogatis v. Mayo Clinic*, 390 N.W.2d 773, 776 (Minn.1986). Therefore, in order to determine whether the statute of limitations precludes Broek from asserting her wrongful-death action, we must determine the applicable medical-malpractice statute of limitations for the alleged negligence of Ranheim and Park Nicollet in treating Uetz. Ranheim and Park Nicollet contend that the limitation period in this case is prescribed by the statute in effect at the time Ranheim last treated Uetz in 1993. *See* Minn.Stat. § 573.02, subd. 1 (1992) (providing that "[a]n action to recover damages for a death caused by the alleged professional negligence of a physician [or] * * * hospital * * * shall be commenced within the time set forth in section 541.07, subdivision 1"); *see also* Minn.Stat. § 541.07 (1992)

(providing that tort actions resulting in personal injury and actions for malpractice, error, mistake, or failure to cure, whether based in contract or in tort, "shall be commenced within two years").

In 1999, however, the legislature changed the law by enacting Minn.Stat. § 541.076 (Supp.1999), a statute dealing specifically with malpractice actions against health-care providers. Under the new statute, malpractice actions against providers "must be commenced within four years from the date the cause of action accrued." *Id.* The statute went into effect on August 1, 1999, and applies to actions commenced on or after that date. 1999 Minn. Laws ch. 23, § 3; *see also Gomon v. Northland Family Physicians, Ltd.,* 645 N.W.2d 413, 419–20 (Minn.2002) (holding that Minn.Stat. § 541.076 operates retroactively to revive plaintiffs' claims that would have expired under prior statute, but fell within time limits of new, four-year statute of limitations).

In 2002, to comport with the change in the medical-malpractice limitations period, the legislature also amended the wrongful-death statute, Minn.Stat. § 573.02. The amended statute requires that an action to recover damages for a death caused by alleged professional negligence of a physician or hospital "shall be commenced within three years of the date of death, but in no event shall be commenced beyond the time set forth in section 541.076." Minn. Stat. § 573.02 (2002). This section also operated retroactively to August 1, 1999. 2002 Minn. Laws ch. 403, § 6. Therefore, the statute of limitations for claims of wrongful death due to medical malpractice in effect at the time Broek initiated this action in March 2002 set a time limit of four years from the date the cause of action accrued, or three years from the date of death.

Consequently, if we conclude that the cause of action accrued in February 1993, when Uetz ended his treatment with Ranheim, the current four-year statute of limitations precludes Broek from bringing her claim. If we conclude, however, that the cause of action did not accrue until Uetz suffered cardiac arrest in September 2000, Broek's claim is not barred and may proceed.

"The general rule with respect to actions for negligence is that the cause of action accrues * * * when the negligent act or omission causes injury on which the injured party could maintain an action." *Wittmer v. Ruegemer,* 419 N.W.2d 493, 496 (Minn.1988). Thus an action does not accrue if it is subject to dismissal for failure to state a claim. *Id.; Bonhiver v. Graff,* 311 Minn. 111, 117, 248 N.W.2d 291, 296 (1976); *see also* Minn. R. Civ. P. 12.02. In tort cases, "causes of action accrue at the time of injury, which usually coincides with the act causing the injury." David W. Feeder II, *When Your Doctor Says, "You Have Nothing to Worry About," Don't Be So Sure: The Effect of Fabio v. Bellomo on Medical Malpractice Actions in Minnesota,* 78 Minn. L.Rev. 943, 952 (1994). To balance concerns about potentially harsh effects of limitations statutes, courts and legislatures have developed tolling doctrines that delay the accrual of the statutory period past the normal accrual date. *Id.* at 951.

Minnesota courts have adopted two equitable tolling measures for medical-malpractice actions: fraudulent concealment by the physician, which is not at issue in this case, and the termination-of-treatment rule. The termination-of-treatment rule, which establishes the accrual date for most medical-malpractice causes of action, delays accrual until treatment for the particular condition is terminated. *Johnson v. Winthrop Labs.,* 291 Minn. 145, 149, 190

N.W.2d 77, 80 (1971). This rule is predicated on the rationale that "the patient must repose reliance upon his physician in the completion of the course of curative treatment, a relationship of trust which inhibits the patient's ability to discover acts of omission or commission constituting malpractice." *Swang v. Hauser*, 288 Minn. 306, 309, 180 N.W.2d 187, 189–90 (1970); *see also Schmit v. Esser*, 183 Minn. 354, 358–59, 236 N.W. 622, 625 (1931) (noting that treatment has not ceased until physician ceases to attend patient or there is nothing more to be done as to particular injury physician was employed to treat). This rule extends the accrual of a cause of action beyond the date when the injury occurred.

Minnesota courts have carved out an exception to the termination-of-treatment rule for cases when the alleged malpractice consists of a single act of negligence that is complete at a precise time, when the act cannot be cured or relieved by a continued course of treatment, and when the plaintiff is aware of facts on which the claim is based. *See, e.g., Murray v. Fox*, 300 Minn. 373, 220 N.W.2d 356 (1974) (applying "single act" exception to cause of action arising from alleged negligent surgical procedure). In these cases, "[a]lleged negligence coupled with the alleged resulting damage is the gravamen in deciding the date when the cause of action accrues." *Offerdahl v. Univ. of Minn. Hosps. & Clinics*, 426 N.W.2d 425, 429 (Minn.1988).

The accrual of a cause of action under either the termination-of-treatment rule or the single-act exception presupposes the existence of an injury that may be attributable to the defendant's negligence—in other words, the element of damage must first exist before an action may be brought. On the admittedly unusual facts of this case, we conclude that the uncontested record establishes that the critical element of injury was missing until September 2000, when Uetz suffered the fatal cardiac arrest. The record simply contains no evidence that Uetz suffered any compensable injury before that time that could be attributable to Ranheim's alleged negligence. Uetz suffered from a congenital heart condition for which he was seen by Ranheim, who assured him that he could continue a vigorous exercise program. Accordingly, Uetz continued to exercise without further symptoms, and, seven years later, suffered cardiac arrest while playing racquetball.

As it currently stands, the record contains no medical evidence that Uetz's preexisting heart condition changed or progressed during the seven-year time period after he consulted with Ranheim. There is no evidence that his rigorous exercise or failure to return to Park Nicollet for periodic checkups caused his condition to deteriorate. The record before us indicates his condition was the same from the date he was seen by Dr. Ranheim until the time of his heart failure. In this respect, this case differs from failure to diagnose or inform, in which the plaintiff's illness or injury progressed during a time period after the alleged negligence occurred, and thus triggered the running of the statute of limitations. *See, e.g., Fabio v. Bellomo*, 504 N.W.2d 758 (Minn.1993) (progression of breast cancer subsequent to alleged misdiagnosis); *D'Amaro v. Joyce*, 297 F.3d 768 (8th Cir.2002) (pulmonary artery abnormality developed into debilitating and life-threatening condition following failure to inform of X-ray results). By all accounts, Uetz's heart defect, most probably a genetic condition, had existed from his birth and produced the same chances of causing injury or death after the alleged negligence as at any time previously in his life. At best, this preexisting condition created an inherent propensity toward injury. But the law does not com-

**444**

pensate the mere possibility of harm. *See Reliance Ins. Co. v. Arneson,* 322 N.W.2d 604, 607 (Minn.1982) (concluding that a threat of future harm, not yet realized, will not satisfy damage requirement in negligence action).

Ranheim argues that if we allow this action to proceed, we would in effect be adopting a "discovery rule," which would toll the medical-malpractice statute of limitations until the plaintiff became aware of the injury for which he seeks compensation. The Minnesota Supreme Court has expressly declined to adopt such a rule, *Johnson,* 291 Minn. at 149, 190 N.W.2d at 80, and it is not within our purview to alter that determination. *St. Aubin v. Burke,* 434 N.W.2d 282, 284 (Minn.App.1989) (noting that only in absence of statutory or judicial precedents will court of appeals make new law), *review denied* (Minn. Mar. 29, 1989). But our decision in this case rests not on Uetz's failure to *discover* a medical injury that may have been attributable to Ranheim's negligence, but rather on the proposition that no injury existed until Uetz suffered cardiac arrest in September 2000. Thus, our analysis reflects an objective standard—ascertainable evidence of injury—rather than a subjective standard—the plaintiff's personal knowledge of such an injury. *See Dalton v. Dow Chem. Co.,* 280 Minn. 147, 154, 158 N.W.2d 580, 585 (1968) (rejecting "subjective determination" of accrual of cause of action).

### DECISION

Under the narrow facts of this case, because no evidence establishes that Uetz suffered compensable injury attributable to Ranheim's alleged negligence before September 2000, we conclude that Broek's claim was timely brought within the applicable statutes of limitation, Minn. Stats. §§ 573.02 and 541.076. Accordingly, we reverse the district court's grant of sum-

mary judgment and remand for trial on the merits.

**Reversed and remanded.**