OPINION OF THE COURT
Jasen, J.
The critical issue common to these two appeals is whether an accountant may be held liable, absent privity of contract, to a party who relies to his detriment upon a negligently prepared financial report and, if so, within what limits does that liability extend.
I
In Credit Alliance Corp. v Andersen & Co. (^‘Credit Alliance”), plaintiffs are major financial service companies engaged primarily in financing the purchase of capital equipment through installment sales or leasing agreements. Defendant, Arthur Andersen & Co. (“Andersen”), is a national accounting firm. Plaintiffs’ complaint and affidavit[1] allege that prior to 1978, plaintiffs had provided financing to L. B. Smith, Inc. of Virginia (“Smith”), a capital intensive enterprise that regularly required financing. During 1978, plaintiffs advised Smith that as a condition to extending additional major financing, they would insist upon examining an audited financial statement. Accordingly, Smith provided plaintiffs with its consolidated financial statements, covering both itself and its subsidiaries, “For The Years Ended December 31, 1977 and 1976” (the “1977 statements”). These statements contained an auditor’s report prepared by Andersen stating that it had examined the statements in accordance with generally accepted auditing standards (“GAAS”) and found them to reflect fairly the financial position of Smith in conformity with generally accepted accounting principles (“GAAP”). In reliance upon the 1977 statements, plaintiffs provided substantial amounts in financing to Smith through various extensions of credit. Thereafter, in 1979, as a precondition to continued financing, plaintiffs requested and received from Smith the consolidated financial statements “For The Years Ended February 28, 1979 and December 31, 1977” (the “1979 statements”). Again, Andersen’s report vouched for its examination of the financial statements and the financial position of *542 Smith reflected therein. Relying upon these certified statements, plaintiffs provided additional substantial financing to Smith.
It is alleged that both statements overstated Smith’s assets, net worth and general financial health, and that Andersen failed to conduct investigations in accordance with proper auditing standards, thereby failing to discover Smith’s precarious financial condition and the serious possibility that Smith would be unable to survive as a going concern. Indeed, in 1980, Smith filed a petition for bankruptcy. By that time, Smith had already defaulted on several millions of dollars of obligations to plaintiffs.
In August 1981, plaintiffs commenced this suit for damages lost on its outstanding loans to Smith, claiming both negligence and fraud by Andersen in the preparation of its audit reports. The complaint alleges that Andersen knew, should have known or was on notice that the 1977 and 1979 certified statements were being utilized by Smith to induce companies such as plaintiffs to make credit available to Smith. The complaint further states that Andersen knew, should have known or was on notice that the certified statements were being shown to plaintiffs for such a purpose.[2] It is also alleged that Andersen knew or recklessly disregarded facts which indicated that the 1977 and 1979 statements were misleading.[3]
On Andersen’s motion to dismiss the complaint, Special Term initially held the negligence cause of action to be barred by the Statute of Limitations, but denied the motion with regard to the claim for fraud. On reargument, the court reversed its dismissal *543 of the negligence cause of action and denied Andersen’s motion in its entirety. On appeal, the Appellate Division affirmed the order below, holding, in part, that despite the absence of contractual privity between the parties, plaintiffs were members of a limited class whose reliance upon the financial statements should have been specifically foreseen by defendants. The court concluded that plaintiffs fell within the exception to the general rule that requires privity to maintain an action against an accountant for negligence. Two Justices dissented on the ground that the rule requiring privity has been repeatedly reaffirmed by this court and mandates dismissal of the action for negligence.
 The Appellate Division granted Andersen’s motion for leave to appeal to this court and certified the following question: “Was the order of the Supreme Court, as affirmed by this Court, properly made?” Because the allegations in plaintiffs’ complaint and affidavit fail to set forth either a relationship of contractual privity with Andersen or a relationship sufficiently intimate to be equated with privity, the first cause of action should be dismissed. Further, inasmuch as plaintiffs’ second cause of action, sounding in fraud, comprises mere conclusory allegations, it also should be dismissed. Accordingly, in Credit Alliance, we now reverse and answer the certified question in the negative.
In European Am. Bank & Trust Co. v Strauhs & Kaye (“European American”), the complaint, together with the affidavit in opposition to the motion to dismiss, alleges that plaintiff, European American Bank and Trust Company (“EAB”), made substantial loans to Majestic Electro Industries and certain of its subsidiaries (collectively, “Majestic Electro”) in March 1979 pursuant to their written agreements. Several months later, EAB partially financed Majestic Electro’s acquisition of Brite Lite Lamps Corp. by again advancing substantial funds.
Beginning in 1979, and continuing thereafter at all relevant . times, Majestic Electro retained defendant Strauhs & Kaye (“S & K”), an accounting partnership rendering services in this State, to audit its financial records in accordance with GAAS and to report its findings in conformity with GAAP. During the course of its lending relationship with Majestic Electro, EAB relied upon the interim and year-end financial reports prepared by S & K to determine the maximum amounts it was willing to lend. From 1979 through 1982, S & K allegedly, inter alia, overstated Majestic Electro’s inventory and accounts receivable, and failed to disclose the inadequacy of Majestic Electro’s internal recordkeeping and inventory control.
*544 When, in December 1982, a Majestic Electro subsidiary defaulted on its loan agreement, EAB caused the subsidiary’s inventory, in which it had a security interest, to be liquidated. It was then that EAB allegedly began to discover that S & K’s reports had seriously exaggerated the financial solvency of Majestic Electro. Indeed, between the time the complaint was filed and the submission of papers upon the motion to dismiss, Majestic Electro filed a petition in bankruptcy. EAB suffered substantial losses from the loans remaining unpaid.
EAB commenced this action in May 1983, seeking damages for those losses allegedly resulting from its reliance upon S & K’s reports. EAB specifically alleges negligence in that S & K, in performing auditing and accounting services for Majestic Electro, at all relevant times knew that EAB was Majestic Electro’s principal lender, was familiar with the terms of the lending relationship, and was fully aware that EAB was relying on the financial statements and inventory valuations certified by S & K. Moreover, it is alleged that representatives of EAB and S&K were in direct communication, both oral and written, during the entire course of the lending relationship between EAB and Majestic Electro, and, indeed, that representatives of EAB and S&K met together throughout this time to discuss S & K’s evaluation of Majestic Electro’s inventory and accounts receivable and EAB’s reliance thereon.[4] The complaint also alleges a *545 second cause of action, merely adding that defendants were “grossly negligent or recklessly indifferent” in performing professional services and that EAB was damaged as a result.
On S & K’s motion, Special Term dismissed the complaint holding that, absent a contractual relationship between the parties or an allegation of fraud, the complaint failed to state a cause of action. On appeal, the Appellate Division unanimously reversed and reinstated the complaint in its entirety. Focusing on the direct communications between the parties, the court held that contractual privity was not a prerequisite to liability inasmuch as S & K specifically knew that their reports would be relied upon by EAB for a particular purpose.
The Appellate Division granted S & K’s motion for leave to appeal to this court and certified the following question: “Was the order of this Court, which reversed the order of the Supreme Court, properly made?” Because EAB’s complaint and affidavit posit a direct nexus between the parties, to wit: the direct communications between them concerning EAB’s intended reliance upon S & K’s financial evaluation of Majestic Electro, the causes of action for negligence and for gross negligence or reckless indifference are adequately alleged. Accordingly, in European American, we now affirm and answer the certified question in the affirmative.
II
In the seminal case of Ultramares Corp. v Touche (255 NY 170), this court, speaking through the opinion of Chief Judge Cardozo more than 50 years ago, disallowed a cause of action in negligence against a public accounting firm for inaccurately prepared financial statements which were relied upon by a plaintiff having no contractual privity with the accountants. This court distinguished its holding from Glanzer v Shepard (233 NY 236), a case decided in an opinion also written by Cardozo nine years earlier. We explained that in Glanzer, an action in negligence against public weighers had been permitted, despite the absence of a contract between the parties, because the plaintiff’s intended reliance, on the information directly transmitted by the weighers, created a bond so closely approaching privity that it was, in practical effect, virtually *546 indistinguishable therefrom. This court has subsequently reaffirmed its holding in Ultramares[5] which has been, and continues to be, much discussed and analyzed by the commentators[5]
[6] and by the courts of other jurisdictions.[7] These appeals now provide us with the opportunity to reexamine and delineate the principles enunciated in both Ultramares and Glanzer. Inasmuch as we believe that a relationship “so close as to approach that of privity” (255 NY, at pp 182-183) remains valid as the predicate for imposing liability upon accountants to noncontractual parties for the negligent preparation of financial reports, we restate and elaborate upon our adherence to that standard today.
The doctrine of privity is said to have had its source in the classic enunciation of its rationale in Winterbottom v Wright (10 *547 M & W109,152 Eng Rep 402).[8] In that case, decided in 1842, the Court of Exchequer held that the defendant, who had failed to keep a mail coach in repair in violation of an agreement made with the purchaser, was not liable to another who suffered injuries while riding in the coach when it collapsed as a result of latent defects. The court ruled that no action could be maintained on defendant’s contract because the plaintiff was not a privy thereto. “Unless we confine the operation of such contracts as this to the parties who entered into them”, remarked Lord Abinger, “the most absurd and outrageous consequences, to which I can see no limit, would ensue.” (10 M & W, at p 114.) In concurrence, Baron Alderson added that (at p 115): “If we were to hold that the plaintiff could sue in such a case, there is no point at which such actions would stop. The only safe rule is to confine the right to recover to those who enter into the contract: if we go one step beyond that, there is no reason why we should not go fifty.” From Winterbottom, the privity doctrine developed into a general rule prevailing well into the Twentieth Century. (See, Note, Auditor’s Liability, 48 Alb L Rev 876, 880-885; Prosser and Keeton, Torts, at 668 [5th ed]; Bohlen, Fifty Years of Torts, 50 Harv L Rev 1225, 1232.)
By the time 90 years had passed, however, this court could note in Ultramares that the “assault upon the citadel of privity is proceeding in these days apace.” (255 NY, at p 180.) We acknowledged that inroads had been made, for example, where third-party beneficiaries or dangerous instrumentalities were involved. (Id., at p 181.) Indeed, we referred to this court’s holding in MacPherson v Buick Motor Co. (217 NY 382) where it was decided that the manufacturer of a defective chattel — there an automobile — may be liable in negligence for the resulting injuries sustained by a user regardless of the absence of privity — a belated rejection of the doctrine of privity as applied to the facts in Winterbottom. Nevertheless, regarding an accountant’s liability to unknown parties with whom he had not contracted, the considerations were deemed sufficiently dissimilar to justify different treatment.
Although accountants might be held liable in fraud to non-privy parties who were intended to rely upon the accountants’ misrepresentations, we noted that “[a] different question develops when we ask whether they owed a duty to these to make [their reports] without negligence.” (Ultramares Corp. v Touche, supra, at p 179.) Disputing the wisdom of extending the duty of *548 care of accountants to anyone who might foreseeably rely upon their financial reports, Cardozo, speaking for this court, remarked: “If liability for negligence exists, a thoughtless slip or blunder, the failure to detect a theft or forgery beneath the cover of deceptive entries, may expose accountants to a liability in an indeterminate amount for an indeterminate time to an indeterminate class. The hazards of a business conducted on these terms are so extreme as to enkindle doubt whether a flaw may not exist in the implication of a duty that exposes to these consequences.” {Id., at pp 179-180.)
In Ultramares, the accountants had prepared a certified balance sheet for their client to whom they provided 32 copies. The client, in turn, gave one to the plaintiff company. The latter, relying upon the misinformation contained in the balance sheet, made loans to the accountants’ client who, only months later, was declared bankrupt. This court, refusing to extend the accountants’ liability for negligence to their client’s lender, with whom they had no contractual privity, noted that the accountants had prepared a report on behalf of their client to be exhibited generally to “banks, creditors, stockholders, purchasers or sellers, according to the needs of the occasion”. (255 NY, at pp 173-174 [emphasis added].) In reciting the facts, we emphasized that: “Nothing was said as to the persons to whom these [copies] would be shown or the extent or number of the transactions in which they would be used. In particular there was no mention of the plaintiff, a corporation doing business chiefly as a factor, which till then had never made advances to the [accountants’ client], though it had sold merchandise in small amounts. The range of the transactions in which a certificate of audit might be expected to play a part was as indefinite and wide as the possibilities of the business that was mirrored in the summary.” {Id., at p 174 [emphasis added].)
The accountants’ report was primarily intended as a convenient instrumentality for the client’s use in developing its business. “[0]nly incidentally or collaterally” was it expected to assist those to whom the client “might exhibit it thereafter”. {Id., at p 183.) Under such circumstances, permitting recovery by parties such as the plaintiff company would have been to impose a duty upon accountants “enforceable] by any member of an indeterminate class of creditors, present and prospective, known and unknown.” {Id., at p 184.)
By sharp contrast, the facts underlying Glanzer bespoke an affirmative assumption of a duty of care to a specific party, for a specific purpose, regardless of whether there was a contractual *549 relationship. There, a seller of beans employed the defendants who were engaged in business as public weighers. Pursuant to instructions, the weighers furnished one copy of the weight certificate to their employer, the seller, and another to the prospective buyer. In reliance upon the inaccurately certified weight, the buyer purchased beans from the seller and, thereby, suffered a loss.
Explaining the imposition upon the weighers of a “noncontractual” duty of care to the buyer, this court held: “We think the law imposes a duty toward buyer as well as seller in the situation here disclosed. The [buyer’s] use of the certificates was not an indirect or collateral consequence of the action of the weighers. It was a consequence which, to the weighers’ knowledge, was the end and aim of the transaction. [The seller] ordered, but [the buyer was] to use. The defendants held themselves out to the public as skilled and careful in their calling. They knew that the beans had been sold, and that on the faith of their certificate payment would be made. They sent a copy to the [buyer] for the very purpose of inducing action. All this they admit. In such circumstances, assumption of the task of weighing was the assumption of a duty to weigh carefully for the benefit of all whose conduct was to be governed. We do not need to state the duty in terms of contract or of privity. Growing out of a contract, it has none the less an origin not exclusively contractual. Given the contract and the relation, the duty is imposed by law (cf. MacPherson v. Buick Motor Co., 217 N. Y. 382, 390).” (233 NY, at pp 238-239 [emphasis added].)
The critical distinctions between the two cases were highlighted in Ultramares, where we explained: “In Glanzer v. Shepard * * * [the certificate of weight], which wás made out in duplicate, one copy to the seller and the other to the buyer, recites that it was made by order of the former for the use of the latter * * * Here was something more than the rendition of a service in the expectation that the one who ordered the certificate would use it thereafter in the operations of his business as occasion might require. Here was a case where the transmission of the certificate to another was not merely one possibility among many, but the ‘end and aim of the transaction/ as certain and immediate and deliberately willed as if a husband were to order a gown to be delivered to his wife, or a telegraph company, contracting with the sender of a message, were to telegraph it wrongly to the damage of the person expected to receive it * * * The intimacy of the resulting nexus is attested by the fact that after stating the case in terms of legal duty, we went on to point *550 out that * * * we could reach the same result by stating it in terms of contract * * * The bond was so close as to approach that of privity, if not completely one with it. Not so in the case at hand [i.e., Ultramares]. No one would be likely to urge that there was a contractual relation, or even one approaching it, at the root of any duty that was owing from the [accountants] now before us to the indeterminate class of persons who, presently or in the future, might deal with the [accountants’ client] in reliance on the audit. In a word, the service rendered by the defendant in Glanzer v. Shepard was primarily for the information of a third person, in effect, if not in name, a party to the contract, and only incidentally for that of the formal promisee.” (Ultramares Corp. v Touche, supra, at pp 182-183 [emphasis added].)
Several years subsequent to the decision in Ultramares, this court reiterated the requirement for a “contractual relationship or its equivalent” (State St. Trust Co. v Ernst, 278 NY 104, 111), and more recently, in White v Guarente (43 NY2d 356), such an equivalent was presented for our consideration. There, the accountants had contracted with a limited partnership to perform an audit and prepare the partnership’s tax returns. The nature and purpose of the contract, to satisfy the requirement in the partnership agreement for an audit, made it clear that the accountants’ services were obtained to benefit the members of the partnership who, like plaintiff, a limited partner, were necessarily dependent upon the audit to prepare their own tax returns. After outlining the principles articulated in Ultramares and Glanzer, this court observed that: “[T]his plaintiff seeks redress, not as a mere member of the public, but as one of a settled and particularized class among the members of which the report would be circulated for the specific purpose of fulfilling the limited partnership agreed upon arrangement.” (43 NY2d, at p 363 [emphasis added].) Because the accountants knew that a limited partner would have to rely upon the audit and tax returns of the partnership, and inasmuch as this was within the specific contemplation of the accounting retainer, we held that, “at least on the facts here, an accountant’s liability may be so imposed.” (Id., at p 358.) The resulting relationship between the accountants and the limited partner was clearly one “approaching] that of privity, if not completely one with it.” (Ultramares Corp. v Touche, supra, at p 183.)[9]
*551 Upon examination of Ultramares and Glanzer and our recent affirmation of their holdings in White,[10] certain criteria may be gleaned. Before accountants may be held liable in negligence to noncontractual parties who rely to their detriment on inaccurate financial reports, certain prerequisites must be satisfied: (1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants’ understanding of that party or parties’ reliance. While these criteria permit some flexibility in the application of the doctrine of privity to accountants’ liability, they do not represent a departure from the principles articulated in Ultramares, Glanzer and White, but, rather, they are intended to preserve the wisdom and policy set forth therein.
We are aware that the courts throughout this country are divided as to the continued validity of the holding in Ultra-mares. Some courts continue to insist that a strict application of the privity requirement governs the law of accountants’ liability except, perhaps, where special circumstances compel a different result. {See, e.g., the following cases where the courts have applied the “general” or “predominant” rule and denied recovery to nonprivy reliant parties: Shofstall v Allied Van Lines (455 F Supp 351 [ND 111] [no special relationship of any kind existed between plaintiff and the accountants]); Koch Indus. v Vosko (494 F2d 713 [10th Cir] [plaintiff was unknown to the accountant]); Stephens Indus. v Haskins & Sells (438 F2d 357 [10th Cir] [no liability for negligence to nonprivy parties — even those the accountant knew or should have known were relying on his audit]); Canaveral Capital Corp. v Bruce (214 So 2d 505 [Fla App] [no liability to nonprivy parties absent fraud or gross negligence]). On the other hand, an increasing number of courts have adopted what they deem to be a more flexible approach than that permitted under this court’s past decisions. A brief examination of some decisions of those courts is instructive.
*552 In Ryan v Kanne (170 NW2d 395 [Iowa]), the court rejected the accountants’ contention that a strict privity doctrine governed accountants’ liability for negligence. Recovery was permitted where the audit report was used as the accountants had contemplated, by a known nonprivy party, to whom one of the accounting partners personally explained the report at meetings they both attended. In Larsen v United Fed. Sav. & Loan Assn. (300 NW2d 281 [Iowa]), the same court permitted recovery by a nonprivy party who had actually paid for the accountant’s appraisal, and was specifically designated on the appraisal itself as the one for whose benefit it was being prepared.
Likewise, in Shatterproof Glass Corp. v James (466 SW2d 873 [Tex Civ App]), where the court held that the accountants were under a duty to exercise due care toward the third party who had loaned money to the accountants’ client in reliance on the financial statements, it was noted that the accountants knew that their reports would be issued to and relied upon by a particular creditor. Moreover, the accountants had furnished information directly to the third-party creditor as authorized by their client and, indeed, they had charged their client a separate and additional amount for rendering such services. Similarly, in Coleco Indus. v Berman (423 F Supp 275 [ED Pa]), the nonprivy parties who relied upon the financial statements had, in fact, chosen the accountants, explained to those accountants the role they were to play in the ongoing transactions, and had direct dealings with them. The court concluded that the “lack of strict privity” should not preclude a negligence claim against the accountants. The relationship existing between the accountants and the nonprivy parties was found to be “‘so close as to approach that of privity, if not completely one with it.’ ” {Id., at p 309.)
In Seedkem, Inc. v Safranek (466 F Supp 340 [DC Neb]), the court declined to apply Ultramares “rigidly” to preclude a suit in negligence by a reliant nonprivy party. There, it was observed, the accountant’s own notes to the financial statements specifically identified plaintiff, recognizing it as a party in privy with the accountant’s client, a principal creditor thereto, and responsible for the client’s incorporation in the State. Under somewhat analogous facts, the court in Rusch Factors v Levin (284 F Supp 85 [DC RI]) permitted liability where the accountant had actually prepared balance sheets for the nonprivy party, with the “end and aim” of influencing that party to extend credit to the accountant’s client.
*553 In all of the foregoing cases, the courts found the facts amenable to the imposition of accountants’ liability under the principles of Ultramares-Glanzer or extended those principles to permit a more liberalized application. To the extent that the holdings in those cases are predicated upon certain criteria — to wit, a particular purpose for the accountants’ report, a known relying party, and some conduct on the part of the accountants linking them to that party — they are consonant with the principles reaffirmed in this decision. To the extent, however, that those cases were decided upon the ground that Ultramares should not be followed and, instead, a rule permitting recovery by any foreseeable plaintiff should be adopted,[11] the law in this State, as reiterated today, is clearly distinguishable.
in
In the appeals we decide today, application of the foregoing principles presents little difficulty. In Credit Alliance, the facts as alleged by plaintiffs fail to demonstrate the existence of a relationship between the parties sufficiently approaching privity. Though the complaint and supporting affidavit do allege that Andersen specifically knew, should have known or was on notice that plaintiffs were being shown the reports by Smith, Andersen’s client, in order to induce their reliance thereon, nevertheless, there is no adequate allegation of either a particular purpose for the reports’ preparation or the prerequisite conduct on the part of the accountants. While the allegations state that Smith sought to induce plaintiffs to extend credit, no claim is made that Andersen was being employed to prepare the reports with that particular purpose in mind. Moreover, there is no allegation that Andersen had any direct dealings with plaintiffs, had specifically agreed with Smith to prepare the report for plaintiffs’ use or according to plaintiffs’ requirements, or had specifically agreed with Smith to provide plaintiffs with a copy or actually did so. Indeed, there is simply no allegation of any *554 word or action on the part of Andersen directed to plaintiffs, or anything contained in Andersen’s retainer agreement with Smith which provided the necessary link between them.
By sharp contrast, in European American, the facts as alleged by EAB clearly show that S & K was well aware that a primary, if not the exclusive, end and aim of auditing its client, Majestic Electro, was to provide EAB with the financial information it required. The prerequisites for the cause of action in negligence, as well as in gross negligence, are fully satisfied. Not only is it alleged, as in Credit Alliance, that the accountants knew the identity of the specific nonprivy party who would be relying upon the audit reports, but additionally, the complaint and affidavit here allege both the accountants’ awareness of a particular purpose for their services and certain conduct on their part creating an unmistakable relationship with the reliant plaintiff. It is unambiguously claimed that the parties remained in direct communication, both orally and in writing, and, indeed, met together throughout the course of EAB’s lending relationship with Majestic Electro, for the very purpose of discussing the latter’s financial condition and EAB’s need for S&K’s evaluation. Moreover, it is alleged that S & K made repeated representations personally to representatives of EAB, on these occasions, concerning the value of Majestic Electro’s assets. It cannot be gainsaid that the relationship thus created between the parties was the practical equivalent of privity. The parties’ direct communications and personal meetings resulted in a nexus between them sufficiently approaching privity under the principles of Ultramares, Glanzer and White to permit EAB’s causes of action.
Finally, disposition of the second cause of action alleged in Credit Alliance need not detain us long. The cause of action for fraud repeats the allegations for the negligence cause of action and merely adds a claim that Andersen recklessly disregarded facts which would have apprised it that its reports were misleading or that Andersen had actual knowledge that such was the case. This single allegation of scienter, without additional detail concerning the facts constituting the alleged fraud, is insufficient under the special pleading standards required under CPLR 3016 (b), and, consequently, the cause of action should have been dismissed. (Cf. Dworman v Lee, 83 AD2d 507, affd 56 NY2d 816; see also, Federation Chems. v Chemical Constr. Corp., 31 AD2d 799, affd 27 NY2d 564.)
Accordingly, in Credit Alliance both causes of action should be dismissed, the order of the Appellate Division reversed, with *555 costs, and the certified question answered in the negative. In European American, the order of the Appellate Division should be affirmed, with costs, and the certified question answered in the affirmative.
Chief Judge Wachtler and Judges Meyer, Simons, Kaye, Titone and Boomer concur; Judge Alexander taking no part.
In Credit Alliance Corp. v Andersen & Co.: Order reversed, etc.
In European Am. Bank & Trust Co. v Strauhs & Kaye: Order affirmed, etc.

. Plaintiffs’ affidavit was submitted in opposition to Andersen’s motion to dismiss under CPLR 3211. (See, Rovello v Orofino Realty Co., 40 NY2d 633.) The allegations therein, together with those contained in the complaint which they supplement, are, of course, assumed to be true for the purposes of this appeal. (See, Becker v Schwartz, 46 NY2d 401, 408.)

. In pertinent part, the complaint states: “Andersen knew, should have known or was on notice that the 1977 certified financial statement was being utilized by L. B. Smith in order to induce companies such as plaintiffs to engage in financial transactions with L. B. Smith and to induce such companies to make credit available to L. B. Smith. Andersen knew, should have known, or was on notice that the 1977 certified financial statement was being shown to plaintiffs for such purposes.” (Emphasis added.) The same allegations are made regarding the 1979 statements.

. In support of plaintiffs’ cause of action predicated on fraud, the complaint states in part: “Andersen knew or recklessly disregarded facts known to them which indicated that those documents were materially misleading as described above. Andersen knew or was on notice of such facts by virtue of the information which came to its attention or which was reasonably available to it during its audits of L. B. Smith. As the auditor of L. B. Smith, Andersen was required to make a full investigation into the market value of L. B. Smith’s inventory, the reasonableness and propriety of the method of depreciation utilized, the adequacy of the allowances for doubtful accounts, and uncertainties concerning L. B. Smith’s future status as a going concern.”

. EAB’s verified complaint, in pertinent part, alleges the following: “In performing auditing and accounting services for Majestic Electro, defendants knew of EAB’s lending relationship with Majestic Electro, and by reason of direct oral and written communication with EAB, its officers and employees, knew at all relevant times herein that EAB was relying upon the services performed by them in reviewing interim and year-end financial statements and in rendering unqualified professional opinions thereon, and in particular in valuing the inventory hypothecated and accounts receivable assigned to EAB as collateral for loans. Defendants knew or should have known that EAB was relying upon defendants to perform the professional services rendered with the integrity, competence, and standard of care required by the accounting profession.” (Emphasis added.)
In its affidavit in opposition to S & K’s motion to dismiss, EAB elaborated (see, n 1, supra) with, inter alia, the following allegations:
“By reason of meetings that were had between representatives of EAB and defendants Strauhs & Kaye during the entire course of the lending relationship previously described, Strauhs & Kaye were well aware of EAB’s identity as Majestic Electro’s principal lender and the terms of the lending relationship and were furthermore fully aware of EAB’s reliance on Strauhs & Kaye’s certifications for determining the permissible amounts of loans under the Security Agreements.
“For the duration of the EAB lending relationship with Majestic Electro, up until about December 1982, defendants Strauhs & Kaye made repeated representations to members of EAB’s staff, in written and in oral form, concerning the value of Majestic Electro’s inventory and accounts receivable. I emphasize *545 that the said representations were not made through representatives of Majestic Electro, but were made directly by Messrs. Strauhs and Kaye to representatives of EAB at various board of directors meetings of Majestic Electro. It was solely on the basis of such representations that EAB determined the maximum amount of loans that could be made to Majestic Electro in accordance with the terms of the Security Agreements.” (Emphasis added.)

. See, e.g., New Castle Siding Co. v Wolfson (63 NY2d 782,784); Dworman v Lee (56 NY2d 816, affg 83 AD2d 507); White v Guarente (43 NY2d 356, 363); State St. Trust Co. v Ernst (278 NY 104, 111).

. See, e.g., Note, Auditor’s Liability, 48 Alb L Rev 876; Comment, The Citadel Falls? — Accountants’ Liability, 59 St John’s L Rev 348; Gormley, The Foreseen, The Foreseeable, and Beyond — Accountants’ Liability to Nonclients, 14 Seton Hall L Rev 528; Besser, Privity? —An Obsolete Approach to Liability of Accountants to Third Parties, 7 Seton Hall L Rev 507; Fiflis, Current Problems of Accountants’ Responsibilities to Third Parties, 28 Vand L Rev 31; Comment, Auditor’s Third Party Liability: an Ill-Considered Extension of the Law, 46 Wash L Rev 675; Comment, Auditor’s Responsibility for Misrepresentation, 44 Wash L Rev 139; Note, Potential Liability of Accountants to Third Parties for Negligence, 41 St John’s L Rev 588; Levitón, Accountants’ Scope of Liability for Defective Financial Reports, 15 Hastings U 436; see also, Restatement (Second) of Torts § 522.

. See, e.g., the following where recovery absent privity was disallowed: Aeronca, Inc. v Gorin (561 F Supp 370 [SDNY]); Briggs v Sterner (529 F Supp 1155 [SD Iowa]); Shofstall v Allied Van Lines (455 F Supp 351 [ND 111]); Koch Indus. v Vosko (494 F2d 713 [10th Cir]); Stephens Indus. v Haskins & Sells (438 F2d 357 [10th Cir]); Investment Corp. v Buchman (208 So 2d 291 [Fla App], cert dismissed 216 So 2d 748 [Fla]); C.I.T. Fin. Corp. v Glover (224 F2d 44 [2d Cir]); Jordan v Madison Leasing Co. (83 Civ 2515 [SWK] [SDNY]); cf. Ernst & Ernst v Hochfelder (425 US 185,214, n 33); Blue Chip Stamps v Manor Drug Stores (421 US 723, 748).
See also, e.g., the following where recovery was allowed despite the absence of privity: Haddon View Inv. Co. v Coopers & Lybrand (70 Ohio St 2d 154,436 NE2d 212); Spherex, Inc. v Grant & Co. (122 NH 898, 451 A2d 1308); Larsen v United Fed. Sav. & Loan Assn. (300 NW2d 281 [Iowa]); Seedkem, Inc. v Safranek (466 F Supp 340 [DC Neb]); Merit Ins. Co. v Colao (603 F2d 654 [7th Cir], cert denied 445 US 1017); Coleco Indus. v Berman (423 F Supp 275 [ED Pa]); Bonhiver v Graff (311 Minn 111, 248 NW2d 291); Aluma Kraft Mfg. Co. v Fox & Co. (493 SW2d 378 [Mo App]); Rhode Is. Hosp. Trust Natl. Bank v Swartz, Bresenoff, Yavner & Jacobs (455 F2d 847 [4th Cir]); Shatterproof Glass Corp. v James (466 SW2d 873 [Tex Civ App]); Ryan v Kanne (170 NW2d 395 [Iowa]); Rusch Factors v Levin (284 F Supp 85 [DC RI]).
See generally, Public Accountants — Liability, Ann., 46 ALR3d 979.

. See, Prosser and Keeton, Torts §§ 93, 96 (5th ed); Savings Bank v Ward (100 US 195, 203); MacPherson v Buick Motor Co. (217 NY 382, 392); Westerhold v Carroll (419 SW2d 73, 76-77 [Mo]).

. Indeed, as a member of the limited partnership and as a specifically intended beneficiary of the partnership’s contract with the accountants, the limited partner might well have been considered actually in privity with the accountants. (See, Aeronca, Inc. v Gorin, 561 F Supp 370, 379, n 21 [SDNY]; Quintet Corp. v Citibank, 589 F Supp 1235; Calamari v Grace, 98 AD2d 74, 82; *551 cf. Home Mut. Ins. Co. v Broadway Bank & Trust Co., 53 NY2d 568, 575; Ultramares Corp. v Touche, 255 NY 170, at pp 180-181.)

. In addition to White v Guarente (43 NY2d 356), this court has most recently applied the Ultramares-Glanzer principles in Dworman v Lee (56 NY2d 816, affg 83 AD2d 507 — recovery denied to plaintiffs who conceded they were merely members of the public relying on financial reports prepared by the accountants) and New Castle Siding Co. v Wolfson (63 NY2d 782 — plaintiff made loans as a mere general creditor of a corporation which had hired the accountants).

. Indeed, certain jurisdictions have unequivocally adopted and applied an unrestricted “foreseeability” rule. (See, e.g., Citizens State Bank v Timm, Schmidt & Co., 113 Wis 2d 376,335 NW2d 361; H. Rosenblum, Inc. v Adler, 93 NJ 324,461 A2d 138; see generally, Note, Auditor’s Liability, 48 Alb L Rev 876, criticizing this extension of the accountant’s legal duty.) A greater number appear to have adopted a rule requiring that the reliant party or his limited class be either known or actually foreseen by the accountants. (See, e.g., Spherex, Inc. v Gratit & Co., 122 NH 898,451 A2d 1308; Aluma Kraft Mfg. Co. v Fox & Co., 493 SW2d 378 [Mo].) Inasmuch as this latter rule, deriving from the Restatement (Second) of Torts § 552, does not include an additional requirement for conduct on the part of the accountants linking them to the noncontractual party or parties, we decline to adopt it.