CYRUS E. MAGNUSSON, COMMISSIONER OF INSURANCE, v. AMERICAN ALLIED INSURANCE COMPANY.
UNITED BENEFIT FIRE INSURANCE COMPANY IN LIQUIDATION, BY NEBRASKA INSURANCE DEPARTMENT, APPELLANT.

189 N. W. (2d) 28.

July 9, 1971—No. 42517.

466

*Keefe, Schantzen & Bradford* and *Curtis M. Bradford,* for appellant.

*Briggs & Morgan* and *Samuel L. Hanson,* for respondent.

Heard before Knutson, C. J., and Murphy, Otis, Rogosheske, and Rolloff, JJ.

CLARENCE A. ROLLOFF, JUSTICE.*

Appeal from an order of the district court disallowing and dismissing with prejudice the claim of United Benefit Fire Insurance Company.

On August 4, 1965, American Allied Insurance Company, hereafter referred to as Allied, was adjudged insolvent, and respondent, Homer A. Bonhiver, was appointed as receiver. See, Magnusson v. American Allied Ins. Co. 282 Minn. 287, 164 N. W. (2d) 867. United Benefit Fire Insurance Company, hereafter referred to as United, was adjudged insolvent after the adjudication of insolvency of Allied. The Nebraska Insurance Department, acting as liquidator of United, filed a timely claim with the receiver of Allied in claim proceedings ancillary to the liquidation of that company. The claim was based upon a reinsurance agreement between Allied and United. The facts were stipulated except for brief testimony of Bonhiver.

In July 1964, United was experiencing financial difficulty and was under pressure from the Nebraska Insurance Department to correct the situation. United contacted Allied and negotiated a reinsurance agreement whereby Allied would provide reinsurance for the liability of United on its policies. A memorandum agreement was signed on July 10, 1964, and at that time United paid to Allied $35,000 on the amount of earned premiums. On October 12, 1964, a detailed formal agreement was signed. The effect of this agreement was to relieve United from carrying as liabilities on its financial statement reserves for losses that were being reinsured. The agreement consisted of three parts, namely, Part A, whereby Allied assumed 100 percent of United's liabilities on certain classes of existing insurance; Part B, whereby Allied assumed 50 percent quotashare of United's liabilities on certain new and renewal business; Part C, whereby Allied agreed to pay in certain cases losses in excess of specified amounts. As consideration for this agreement, United agreed to pay Allied

*Acting as Justice of the Supreme Court by appointment pursuant to Minn. Const. art. 6, § 2, and Minn. St. 2.724, subd. 2.

varying percentages of earned premiums on policies issued by United.

The Nebraska Insurance Department would not permit United to eliminate its reserves for liabilities as contemplated under the reinsurance agreement unless Allied were paid in full for premiums then due. In response to this requirement, William C. Brickey, president and controlling shareholder of United, attempted to make arrangements for the payment of premiums due Allied, which at the time amounted to $194,000. On or about July 22, 1964, Brickey delivered to Allied a cashier's check for $50,000, made payable to "William C. Brickey, General Agent—United Benefit"; also delivered were two checks, each in the amount of $72,000, drawn on the account of General Leasing Corporation, a company owned and controlled by Brickey. United debited its reinsurance payable account in the amount of $194,000 and treated the transaction as a contribution to surplus by Brickey and issued to him surplus notes in that amount. On July 22, 1964, Allied advised the Nebraska Insurance Department that Allied had received $229,000 from United in payment of premiums then due. In fact, however, the two checks for $72,000 each were never paid, although the $50,000 cashier's check which Brickey had endorsed to Allied was paid. On or about September 24, 1964, Brickey gave two demand notes to Allied in the amount of $72,000 each, back-dated to July 22, 1964, in exchange for the two checks of like amount which had not been paid. Prior to October 1, 1964, Brickey gave to Allied a check for $44,000, drawn on an account of General Leasing Corporation. This check was paid. This sum, together with the cashier's check of $50,000, made a total payment of $94,000, leaving a balance of $100,000 to be paid by United to Allied.

On or about October 4, 1964, Phillip Kitzer, Jr., an owner, officer, and director of Allied, hereafter referred to as Kitzer, agreed to loan to Brickey personally the $100,000 needed to complete the payment to Allied. On October 12, 1964, Kitzer drew a check payable to himself on the account of Plymouth Insurance

Agency, Inc., which was wholly owned and controlled by Kitzer or his family. Kitzer then endorsed the check to Republic Casualty Company, a corporation owned and controlled by Brickey. Brickey, as president of Republic Casualty Company, endorsed this check to Allied and returned the check to Kitzer. This check was never paid nor was it delivered by Kitzer to Allied. In exchange for this $100,000 check, Brickey caused Republic Casualty Company to execute and deliver to Kitzer its note for $100,000, dated October 12, 1964, payable to Kitzer. On October 12, 1964, Allied again advised the Nebraska Insurance Department that Allied had been paid in full "for funding of March 31, 1964 assumption." Kitzer retained possession of said note until sometime after December 31, 1964. On November 12, 1964, Brickey paid Kitzer $25,000 on the note by check drawn on Wil-Brick Company, a corporation controlled by Brickey. No part of that $25,000 was ever delivered by Kitzer to Allied, but instead it was retained by him. Allied continued to carry on its books an account receivable due from United and it did not receive or record any payment with respect to the $25,000. Sometime after December 31, 1964, Kitzer assigned the $100,000 note of Republic Casualty Company to Allied Realty of St. Paul, Inc., hereafter referred to as Realty. This corporation was a wholly owned subsidiary of Allied. In exchange for said note Kitzer first received a stock certificate of Realty in his own name. Thereafter Kitzer caused that stock certificate to be canceled and a new certificate issued to Allied, in exchange for which Allied issued a surplus note to Kitzer for $100,000. At various times thereafter, Kitzer made cash withdrawals from Allied in the amount of $250,000 against that and other surplus notes which had been issued to him.

After Allied had been adjudged insolvent, the receiver found among the assets of the Realty subsidiary the $100,000 note of Republic Casualty Company. He started action on this note. After the action had been commenced, a payment of $10,000 was made on January 17, 1966, by Republic Casualty Company to the receiver on this note. No further payments were made. The de-

fendant in that action, Republic Casualty Company, subsequently was placed in receivership. Judgment was entered by default in the sum of $75,000.

The dispute in this case concerns whether the $100,000 involved in the foregoing transactions has been paid to Allied as premiums due under Part A of the reinsurance agreement. There is no dispute as to the amounts due Allied under Parts B and C of the reinsurance agreement. At the time the reinsurance agreement was made, the amount of earned premiums due to Allied under Part A was $194,000. At the time of the receivership, the balance apparently had increased to $208,485.12. United had paid reinsurance losses in the amount of $192,530.59, for which it was entitled to reimbursement from Allied. Allied had reimbursed United for losses paid by it in the sum of $58,489.36, leaving a net due to United of $134,041.23. It has been stipulated that premiums due to Allied under Part B amount to $36,767.26 and under Part C, $40,000. A recap of these items follows:

*Part A*
Total premiums due Allied from United: $208,485.12
Less payments made by United to Allied:

|  | | |
|---|---|---|
| $35,000 | | |
| 50,000 | | |
| 44,000 | 129,000.00 | |
| | | |
| Net amount due Allied under A | 79,485.12 | $79,485.12 |
| *Part B* | | |
| Amount due Allied for premiums | 36,767.26 | 36,767.26 |
| *Part C* | | |
| Amount due Allied for premiums | 40,000.00 | 40,000.00 |
| | | |
| Total due Allied for premiums | | $156,252.38 |

Less losses paid by
United which were the
obligation of Allied   134,041.23

Less payment by Re-
public to receiver after
action on note          10,000.00
Total credits                               144,041.23

Net due Allied                          $ 12,211.15

■ United claims that it had paid Allied $100,000 in addition to the $129,000 Allied admits it received. That claim is predicated on the check and note, each in the amount of $100,000, hereinbefore referred to. The contention cannot be sustained. It is clear that the transactions between Kitzer as owner of Allied and Brickey as owner of United amounted to a conspiracy to defraud the creditors and policyholders of their respective companies and other companies controlled by them for the purpose of converting the assets of these companies to their own use. The check of $100,000 given by Kitzer was never delivered to Allied and was never cashed, so there was no consideration for the $100,000 note of Republic Casualty Company. That note was never delivered to Allied as payment for premiums due, and even if it had been delivered, it would not constitute payment of the debt of United in the absence of a specific agreement that acceptance of the note would operate as payment. 14 Dunnell, Dig. (3 ed.) § 7444; Penn Anthracite Min. Co. v. Clarkson Securities Co. 205 Minn. 517, 287 N. W. 15. There was no entry on either the records of Allied or Realty which in any way connected the promissory note with the premiums due or with premiums paid under the reinsurance agreement. Clearly, the $100,000 check and note were a sham device intended by Kitzer and Brickey to deceive the Nebraska Insurance Department and to defraud the creditors of the respective companies. These transactions did not have the legal effect of reducing the liability of United to Allied in any amount.

■ United filed its claim for an undetermined amount, stating:

"* * * This claim covers the results of various transactions under a Reinsurance Agreement signed in October and November 1964 (copy attached). The amount due is subject to adjustment depending on the runoff of the business coming under this Agreement."

The fact that United's claim was for an "undetermined" amount indicates that United deemed it necessary that an accounting be had to determine the amount of its claim. The trial court in denying the claim necessarily must have made such an accounting and determined that the amount due Allied was greater than the amount due to United. The evidence well justifies such a conclusion and is sufficient to sustain the trial court's order disallowing the claim.

■ United claims, however, that when Allied's receiver brought an action on the $100,000 note executed by Republic Casualty and obtained a default judgment, this constituted an election of remedies and therefore barred him from claiming a setoff against the claim of United. This claim cannot be sustained. The doctrine of election of remedies has reference to situations in which a party is required to adopt one of two or more coexisting and inconsistent remedies which the law affords upon the same state of facts. The purpose of the doctrine is not to prevent recourse to any particular remedy but to prevent double redress for a single wrong. 6B Dunnell, Dig. (3 ed.) § 2910; Geo. A. Hormel Co. v. First Nat. Bank, 171 Minn. 65, 212 N. W. 738; Hardware Mutual Cas. Co. v. Ozmun, 217 Minn. 280, 14 N. W. (2d) 351. In the instant case, the $100,000 promissory note of Republic Casualty and the $100,000 account due from United to Allied were completely separate and distinct causes of action. The note and debt were owned by separate entities. The $100,000 note was never received or held by Allied and could not provide the basis for a remedy on Allied's reinsurance claim. That note was purchased by Realty and was not taken in satisfaction of any premium debt owed to Allied. Instead, Realty received the note in consideration for issuing its stock to Kitzer.

This stock was later transferred by Kitzer to Allied in exchange for an Allied surplus note. The cause of action on the note held by Realty and the claimed setoff of the indebtedness of United to Allied did not arise out of the same set of facts, but rather were based on separate contractual obligations between different parties. As such, they did not constitute inconsistent substantive rights or remedies; hence, the doctrine of election of remedies does not apply.

■ United also claims that the acts of Kitzer as an officer of Allied in accepting the $100,000 note and the payment of $25,000 by Republic Casualty Company to him on that note were binding on Allied and constituted payment of Allied's claim against United. Even assuming that this defense would be available against Allied, it cannot constitute a defense against the receiver in this case. The receiver represents the rights of creditors and is not bound by the fraudulent acts of a former officer of the corporation. In German-Am. Finance Corp. v. Merchants & Mfrs. State Bank, 177 Minn. 529, 535, 225 N. W. 891, 893, 64 A. L. R. 582, 586, it is stated:

" 'While the general rule undoubtedly is that the receiver of an insolvent corporation has no greater rights than those possessed by the corporation itself and a defendant in a suit brought by him may take advantage of any defense that might have been made if the suit had been brought by the corporation before its insolvency, it is equally true that when an act has been done in fraud of the rights of the creditors of the insolvent corporation the receiver may sue for their benefit, even though the defense set up might be valid as against the corporation itself.' Lyons v. Benney, 230 Pa. 117, 79 A. 250, 34 L.R.A. (N.S.) 105, and cases cited; Farmers & M. State Bank v. Cons. School Dist. No. 3, 174 Minn. 286, 219 N. W. 163, citing Divide County v. Baird, 55 N. D. 45, 212 N. W. 236, 51 A. L. R. 296; 23 R. C. L. 116, et seq."

United also claims that there can be no setoff because the contract of reinsurance provides:

"Should either the Company [United] or the Reinsurer [Allied] be obligated for sums due the other party, the other party shall be entitled to deduct from any sums which may be or become due to the Reinsurer or the Company under this or any other Contract or Contracts of Reinsurance *except that in case of Liquidation or Receivership this Clause shall have no force or effect.*" (Italics supplied.)

The italicized portion of this provision eliminates the contractual right of setoff between the parties, but it does not exclude any right of setoff which otherwise would be available. At the times here involved there was in effect a statute relating to setoffs in insurance company receiverships. Minn. St. 1965, § 60.875, subd. 35, so far as here material, provided:

"In all cases of mutual debits or mutual credits between the insurer and another person, such credits and debits shall be setoff and the balance only allowed or paid."

Under Minn. St. 645.44, subd. 7, the term "person" includes corporations. The statutory provision for setoff controls whether or not there was a contractual right of setoff, and, accordingly, it is controlling under the circumstances of this case.

The order of the trial court is affirmed.

Affirmed.