James A. **BARTHOLOMEW** and Light-house Management Group, Inc., as Receiver for Lakeland Construction Finance, LLC, Plaintiffs,

v.

**AVALON CAPITAL GROUP, INC., Defendant.**

Civil No. 09–1279 (MJD/AJB).

United States District Court, D. Minnesota.

Nov. 30, 2009.

---

Edward T. Wahl, Faegre & Benson LLP, for Plaintiffs.

Jason R. Asmus, Briggs and Morgan, P.A., for Defendant.

## Amended Memorandum of Law & Order

MICHAEL J. DAVIS, Chief Judge.

### I. INTRODUCTION

This matter comes before the Court on Defendant's Motion to Dismiss [Docket No. 8]. Plaintiffs filed this Complaint requesting Avoidance of Fraudulent Transfers under the Minnesota Uniform Fraudulent Transfer Act ("UFTA"), Recovery of Illegal Purported Equity Transfers under Minnesota Statute section 322B.54, Breach of Fiduciary Duty, and Unjust Enrichment. The Court heard oral arguments on October 16, 2009.

### II. FACTUAL BACKGROUND

#### A. Parties

Lakeland Construction Finance, LLC ("Lakeland") is a Minnesota limited liability company that has its principal place of business in Eagan, Minnesota. Lakeland operated as a non-bank finance lender that provided short-term secured construction and land development loans to developers and home builders of single-and multi-family homes. The Lakeland loans were financed through a combination of bank debt, asset securitizations, capital contributions, net earnings, and loans by its principal shareholder, Defendant Avalon Capital Group, Inc. ("Avalon"). Lakeland has become insolvent and is now controlled by Plaintiffs, James A. Bartholomew and Lighthouse Management Group, Inc. (collectively "the Receiver"), as the court appointed Receiver.

Avalon is a Delaware corporation with its principal place of business in California. Prior to Lakeland entering into receivership, Avalon owned all of the voting units of Lakeland and acted as Lakeland's sole manager.

#### B. Bank of Scotland Loans and Equity and Debt Transfers to Avalon

In September 2007, Lakeland entered into two agreements and subsequent loans with the Bank of Scotland ("BOS") and BOS (USA) Inc., a subsidiary of BOS. On September 4, 2007, Lakeland and BOS signed a Credit and Security Agreement ("Senior Credit Agreement"), under which BOS agreed to make certain loans of up to $425 million to Lakeland. That same day, Lakeland borrowed $360 million under the Senior Credit Agreement to pay outstanding debts to other creditors. On September 27, 2007, Lakeland entered into a Term Loan Agreement with BOS (USA) Inc., under which BOS (USA) Inc. agreed to make loans of up to $70 million to Lakeland. The following day, Lakeland borrowed $70 million under the Term Loan Agreement. Lakeland's indebtedness under both the Senior Credit Agreement and the Term Loan Agreement was secured by a security interest in substantially all of Lakeland's assets.

On September 28, 2007, the same day that Lakeland borrowed the $70 million

under the Term Loan Agreement, Lakeland directed BOS (USA) Inc. to transfer $33,927,537.26 of the Term Loan proceeds to Avalon for interest and principal on unsecured debt owed to Avalon by Lakeland, and $25,476.028.72 of the Term Loan proceeds to Avalon to redeem an unspecified number of Avalon's preferred member interests. Additionally, Lakeland directed BOS (USA) Inc. to transfer $8,096,434.02 of Term Loan proceeds to Avalon to pay dividends on Avalon's preferred member interests. In total, Lakeland transferred approximately $67.5 million of the Term Loan proceeds to Avalon.

## C. Lakeland Defaults and Receiver Appointed.

On October 31, 2007, Avalon advanced $4 million to Lakeland to enable Lakeland to make its October principal and interest payment to BOS under the Senior Credit Agreement. One month later, on November 30, 2007, Avalon advanced an additional amount of $4.5 million to Lakeland to enable Lakeland to pay its November principal and interest payment to BOS under the Senior Credit Agreement. After Lakeland made the November 2007 payment to BOS, it defaulted under the Senior Credit Agreement, failing to make any additional payments to BOS. To date, Lakeland has failed to date to make any payments under the Term Loan Agreement.

Between January 2008 and September 2008, throughout several communications between Lakeland and BOS and BOS (USA) Inc., Lakeland acknowledged that it was in default under both the Senior Credit Agreement and the Term Loan Agreement. Due to Lakeland's defaulting on the loans, BOS moved to establish a receivership and appoint a receiver for the management, operations and assets of Lakeland.

On October 31, 2008, the Honorable Ann Alton issued an order in Hennepin County District Court, establishing a receivership and appointing a receiver for Lakeland. The court found that, as of September 2008, Lakeland was insolvent and owed $340,407,204.37 to BOS under the Senior Credit Agreement, and $77,239,353.57 to BOS (USA) Inc. under the Term Loan Agreement. Accordingly, the court appointed James A. Bartholomew and Lighthouse Management Group, Inc. (collectively "the Receiver") as receiver for Lakeland, instructing the Receiver to oversee the management, operations and assets of Lakeland.

## D. The Dispute

On May 22, 2009, the Receiver sued Avalon in Hennepin County District Court in order to recover the $67.5 million of the Term Loan proceeds transferred from Lakeland to Avalon in September 2007. Plaintiffs asserted nine claims against Avalon; however the first three will be dismissed per Plaintiffs' concession in their Memorandum in Opposition of the Motion to Dismiss [Docket No. 12]. The remaining claims are: (Count IV) avoidance of fraudulent transfer made with actual intent to defraud creditors; (Count V) avoidance of fraudulent transfer; (Count VI) recovery of illegal purported equity transfers; (Count VII) breach of fiduciary duty (purported equity transfers); (Count VIII) breach of fiduciary duty (purported debt transfers); and (Count IX) unjust enrichment. Avalon removed the case to this Court and has moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

## III. DISCUSSION

Avalon asserts two sets of arguments to support its Motion to Dismiss. First, it

argues that Counts IV, V, VII, VIII and IX must be dismissed as a matter of law because they assert no viable cause of action. Second, it asserts that all of Plaintiffs' Counts must be dismissed because Plaintiffs have failed to plead sufficient facts to support those causes of action.

## A. Minnesota Uniform Fraudulent Transfer Act ("UFTA") Claims

### 1. Plaintiffs' Standing as a Receiver

■ In Counts IV and V, Plaintiffs seek avoidance of the debt transaction under sections 513.44(a)(1) and 513.45(b) of the UFTA. Defendant moves to dismiss these counts due to a lack of standing. Defendant argues that because the UFTA protects only creditors and not transferors, a receiver, sitting in a transferor's place, has no standing to bring suit.

Sections 513.44(a)(1) and 513.45(b) of the UFTA do indeed protect creditors rather than transferors of debt. Section 513.44(a)(1) provides:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor.

Minn.Stat. § 513.44(a)(1). Similarly, section 513.45(b) provides:

A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Minn.Stat. § 513.45(b). Moreover, only creditors are entitled to remedies under the UFTA. Minn.Stat. §§ 513.47, 513.48(b) ("[T]o the extent a transfer is voidable in an action by a creditor ... the creditor may recover judgment for the value of the asset transferred ... or the amount necessary to satisfy the creditor's claim, whichever is less.")

Here, however, the Receiver Plaintiffs assert Counts IV and V on behalf of Lakeland's creditors, rather than on behalf of Lakeland, the debtor. Defendant disputes Plaintiffs' standing to sue on behalf of said creditors.

■ "A plaintiff has the burden of establishing subject matter jurisdiction, for which standing is a prerequisite." *Jones v. Gale*, 470 F.3d 1261, 1265 (8th Cir.2006) (citations omitted). In order to properly dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the complaint must be successfully challenged on its face or on the factual truthfulness of its averments. In a facial challenge to jurisdiction, all of the factual allegations concerning jurisdiction are presumed to be true and the motion is successful if the plaintiff fails to allege an element necessary for subject matter jurisdiction. *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir.1993) (citations omitted). "In a factual attack, the court considers matters outside the pleadings, and the non-moving party does not have the benefit of 12(b)(6) safeguards." *Osborn v. United States*, 918 F.2d 724, 729 n. 6 (8th Cir.1990) (citations omitted). "The district court has the authority to consider matters outside the pleadings on a motion challenging subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). The court's election to do so does not convert the 12(b)(1) motion to dismiss into a motion for summary judgment." *Deuser v. Vecera*, 139 F.3d 1190, 1192 n. 3 (8th Cir.1998) (citations omitted). Defendant's motion to dismiss constitutes a facial challenge because it attacks Plain-

tiff's ability, as a receiver, to sue on behalf of third party creditors.

■ In disputing Plaintiff's standing, Defendant relies on the Minnesota LLC Act, which does not expressly grant a receiver the rights that belong to creditors of a limited liability company. *See* Minn. Stat. chapter 322B. Defendant then points to the federal Bankruptcy Code which empowers bankruptcy trustees to bring claims that belong to creditors under state fraudulent transfer laws. *Stalnaker v. DLC, Ltd.*, 376 F.3d 819, 823 (8th Cir.2004) ("11 U.S.C. § 544(b)(1) authorizes the trustee to exercise an existing unsecured creditor's right to avoid a transfer if the creditor holds such a right under non-bankruptcy law."). In light of the federal Bankruptcy Code, Defendant suggests that that the Minnesota legislature's "silence" in the LLC Act evinces its intent to keep court appointed receivers from having similar power. Defendant argues that the only time a receiver can bring a claim under the UFTA is when the company under receivership is itself a creditor.

■ The Court recognizes the contrary holdings by the Second and Seventh Circuit, but these opinions do not examine Minnesota law and are not binding on this Court. *Cf. Eberhard v. Marcu*, 530 F.3d 122, 132 (2d Cir.2008); *Troelstrup v. Index Futures Group, Inc.*, 130 F.3d 1274 (7th Cir.1997). Minnesota courts have not definitively decided whether a receiver can bring UFTA claims on behalf of third party creditors. The Minnesota Supreme Court has held, however, that a receiver occupies a fiduciary relationship, and is trustee for all parties interested in the party entrusted to him. *Shadewald v. White*, 74 Minn. 208, 77 N.W. 42, 42 (1898). In general, Minnesota case law supports the proposition that a receiver may file suit on behalf of third-party creditors to retrieve fraudulently transferred funds or

assets. On appointment, a receiver "succeeds to the rights of the creditors, as well as of the insolvent corporation, and has the power to enforce the rights which the creditors, but for the [receivership] proceedings, might have enforced in their own behalf." *Minnesota Thresher Mfg. Co. v. Langdon*, 44 Minn. 37, 46 N.W. 310, 311 (1890). "If defendants connived ... to divert the corporate assets ... there can be no doubt that the creditors have a right to complain and that the receiver may proceed to enforce these rights in their behalf." *Rogers v. Drewry*, 196 Minn. 16, 264 N.W. 225 (1936). The Minnesota Supreme Court has further held:

> While the general rule undoubtedly is that the receiver of an insolvent corporation has no greater rights than those possessed by the corporation itself and a defendant in a suit brought by him may take advantage of any defense that might have been made if the suit have been brought by the corporation before its insolvency, it is equally true that when an act has been done in fraud of the rights of the creditors of the insolvent corporation the receiver may sue for their benefit, even though the defense set up might be valid against the corporation itself.

*Magnusson v. American Allied Ins. Co.*, 290 Minn. 465, 189 N.W.2d 28, 33–34 (1971) (citations omitted). Defendant contends that *Magnusson* merely allows a receiver to bring a cause of action belonging to a corporation in receivership, without being subject to defenses arising from the fraudulent acts of a corporate officer. This Court finds no meaningful distinction between a case where an insolvent company has a cause of action subject to a dispositive defense and a case where the company has no cause of action at all. In accordance to Minnesota law, the Receiver Plaintiffs have standing to bring UFTA

claim against Defendant on behalf Lakeland's third party creditors.

Moreover, the receivership Order itself implies that Plaintiffs have the authority to sue on behalf of Lakeland's creditors. The Minnesota Court of Appeals has ruled that "the purpose and scope of a receivership is defined by court order," and includes the implied authority to implement that order. *Equity Trust Co. Custodian FBO v. Cole*, 766 N.W.2d 334, 341 (Minn.Ct.App.2009); *Hancock–Nelson Mercantile v. Weisman*, 340 N.W.2d 866, 869 (Minn.Ct.App.1983). Judge Alton's Order includes several pertinent grants of authority to Plaintiffs. First, the Order vests the Receiver with "all powers and authority usually held by Receivers." Second, the Order authorizes the Receiver to "investigate and pursue all claims that Lakeland or the Receiver may have against any third party, including … fraudulent transfer … claims." Third, the Order authorizes that, after payment of the Receiver's expenses and fees, all proceeds go to Lakeland's creditors, which are the beneficiaries of the receivership. Finally, in paragraph 4(j), the Order distinguishes between claims belonging to Lakeland and claims belonging to the Receiver. This suggests that Judge Alton intended for the Receiver to have rights to claims that are independent of those owned by Lakeland itself.

### 2. Count IV—Intentional Fraudulent Transfer Under UFTA

▇▇▇ Defendant argues that even if Plaintiffs have standing to sue under the UFTA, they have nonetheless failed to assert sufficient facts in Counts IV and V. Under the Federal Rules of Civil Procedure, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This pleading requirement does not require detailed factual allegations. *Bell Atlantic Corp. v. Twombly*, 550 U.S 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Twombly*, 550 U.S. at 570, 127 S.Ct. at 1974). However, a complaint that states "naked assertion[s]" lacking any "further factual enhancement" is insufficient. *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955. Finally, Plaintiffs must plead allegations of fraud with particularity. Fed. R. Civ. P. 9(b).

Defendant asserts that Count IV should be dismissed because it fails to allege any facts showing actual intent to defraud, as required under Minn.Stat. § 513.44(a)(1). Section 513.44(a)(1) states that a transfer made to a debtor is fraudulent as to a creditor if the debtor made the transfer "with actual intent to hinder, delay, or defraud any creditor of the debtor." Minn.Stat. § 513.44(a)(1).

The Complaint alleges that the debt transfer was made with intent to hinder, delay or defraud Lakeland's creditors because: (1) the transfer was made to an insider; (2) the value of the consideration received by Lakeland was not equivalent to the value of the asset transferred; (3) at the time of the transfer, or shortly thereafter, Lakeland was insolvent; and (4) Avalon caused Lakeland to incur indebtedness to BOS (USA) Inc. on the same day it received the transfer. Plaintiffs correctly state that all of these factors can be properly considered when determining "intent to defraud." *See* Minn.Stat. § 513.44(a)(2)(b).

Here, Plaintiffs' allegation of insider trading is indeed indicative of intent to defraud. Plaintiffs allege that Defendant's role as sole manager made it privy to Lakeland's financial condition. As a result,

Plaintiffs contend that Defendant should have known Lakeland would soon have trouble satisfying its financial obligations. Further, the Complaint alleges that Lakeland was insolvent at the time of the transfer, or shortly thereafter. A "debtor who is generally not paying debts as they become due is presumed to be insolvent." Minn.Stat. § 513.42(b). In the Complaint, Plaintiffs assert that Lakeland admitted to be in default on the Senior Credit Agreement and Term Loan Agreement. Finally, the Complaint suggests that, although Lakeland paid its obligations under the Senior Credit Agreement for two months after the transfer, it had to borrow from Defendant to do so. These facts make out a reasonable implication that that Defendant knew of Lakeland's imminent insolvency. As a result, this claim may go forward.

### 3. Count V—Fraudulent Debt Transfer Under UFTA

■ Defendant also asserts that Count V should be dismissed because the Complaint fails to adequately allege that Lakeland was insolvent at the time of the debt transfer, as required by Minnesota Statute section 513.45(b). Section 513.45(b) states, "[a] transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent." Minn.Stat. § 513.45(b).

Plaintiffs assert that Lakeland was insolvent at the time of the transfer because: (1) Avalon received $67.5 million from Lakeland on the same day Lakeland entered into the Term Loan Agreement; (2) Lakeland failed to make any payments under the Term Loan Agreement; (3) Lakeland only made two payments under the Senior Credit Agreement; and (4)

Lakeland borrowed $8.5 million from Avalon in order to make the payments under the Senior Credit Agreement. Plaintiffs properly pleaded facts that could reasonably indicate Lakeland's insolvency. Specifically, Plaintiffs claimed that Lakeland could not pay off its debt without borrowing money from Defendant for the two months immediately after the disputed transfers. As a result, this claim may proceed.

### B. Count VI—Illegal Equity Distribution

■ Defendant contends that Count VI, recovery of illegal purported equity transfers under Minn.Stat. § 322B.54, should also be dismissed for failure plead sufficient facts to show an illegal distribution. Section 322B.54 allows an LLC to make a distribution if the company "will be able to pay its debts in the ordinary course of business after making the distribution." Minn.Stat. § 322B.54, subd. 1(a).

In the Complaint, Plaintiffs allege that "Avalon made no effort to determine whether Lakeland would be able to pay its debts as they became due in the ordinary course of business after making the Purported Equity Transfers." To support this allegation, Plaintiffs point to Lakeland's immediate need to borrow money from Avalon to pay its debts under the Senior Credit Agreement and its failure to ever make any payments under the Term Loan Agreement. The Court finds that the facts, as pleaded by Plaintiffs, sufficiently imply either Defendant's knowledge of Lakeland's inability to pay off debt in the ordinary course of business or Defendant's failure to examine Lakeland's financial health. The Complaint adequately puts the Defendant on notice of the basis for this cause of action and contains sufficient facts to survive Defendant's Motion to Dismiss.

## C. Plaintiffs' Fiduciary Duty Claims

In Counts VII and VIII of the Complaint, Plaintiffs allege that Defendant breached a fiduciary duty owed to Lakeland.

### 1. Count VII Fiduciary Duty Owed to Lakeland With Respect to Equity Transfer

 Plaintiffs state that Defendant violated its duty of loyalty to Lakeland by wrongfully causing Lakeland to take out $67.5 million in secured debt from BOS only to use the funds to pay out equity and dividends to Defendant and repay debt owed to Defendant. According to Plaintiffs, Defendant breached its fiduciary duty to Lakeland because, by paying out the equity and dividends, it deprived Lakeland of sorely needed capital and left it unable to pay its debts in the ordinary course of business. Plaintiffs allege that Avalon was the manager and controlling member of Lakeland and therefore owed Lakeland a fiduciary duty of loyalty, to act in good faith and in the best interests of Lakeland with due care under Minnesota Statute section 322B.69. Unlike fiduciary duties owed to Lakeland's creditors, these duties exist regardless of the financial health of the company. *See* Minn.Stat. § 322B.69 (containing no limiting language requiring insolvency or knowledge of imminent insolvency). Therefore, at all times, Defendant's duty of loyalty to Lakeland prohibited Defendant from serving "its own personal interests at the expense of the corporation and its stockholders." *Diedrick v. Helm,* 217 Minn. 483, 14 N.W.2d 913, 919 (1944).

Defendant contends that this theory is duplicative of Count VI and should not be recognized by the Court. Count VI alleges an illegal purported equity transfer under Minnesota Statute section 322B.54. Section 322B.54 states that "[t]he limited liability company may make the distribution if it is able to pay its debts in the ordinary course of business after making the distribution." Minn.Stat. § 322B.54 subd. 1(b). The issue thus becomes whether an equity transfer to an insider can simultaneously abide by section 322B.54 and violate the insider's fiduciary duty to the company. Theoretically, an insider who authorizes the payment of equity, at an amount higher than the value of the shares, has violated its fiduciary duty to act in the company's best interest. The fiduciary duty could be breached regardless of whether the equity transfer leaves the company capable of paying its debts in the ordinary course of business. The two claims allege separate grounds for relief and may both proceed as a matter of law.

 An insider transaction is presumed to be a conflict of interest and the burden is on the insider to prove that it did not breach its duties of loyalty and good faith. *See Miller v. Miller,* 301 Minn. 207, 222 N.W.2d 71, 82 (1974). Similarly, "transactions involving corporations under the common control of the same officers or directors are to be regarded with skepticism by the courts and closely scrutinized." *Swanson v. Tomlinson Lumber Mills, Inc.,* 307 Minn. 180, 239 N.W.2d 216, 221 (1976). In their Complaint, Plaintiffs allege that Lakeland received less than a reasonably equivalent value in exchange for the Purported Equity Transfers and left Lakeland in a difficult financial position. Because defendants have not rebutted the presumption created by the insider transfer, the Court finds that Plaintiffs' Complaint adequately pleads facts that support its claim of breach of a fiduciary duty owed to Lakeland.

### 2. Count VIII Fiduciary Duty Owed to Lakeland With Respect to Debt Transfer

 Plaintiffs also allege that, as manager and majority owner of Lakeland, De-

fendant violated a duty of loyalty to act in good faith and in the best interests of Lakeland as a result of the purported debt transfer. As noted in the previous section, Plaintiffs must meet a lower standard for allegations related to insider trading. This claim can proceed as long as it has properly been pled by Plaintiffs in the complaint.

In their complaint, Plaintiffs allege that Lakeland was insolvent or made insolvent when Defendant caused Lakeland to take out the debt with BOS and BOS (USA) Inc. Defendant argues, however, that the financial transfers had no adverse impact on Lakeland. Specifically, Lakeland's position did not worsen because it went from owing money to the Defendant to owing the same exact money to the Bank of Scotland. In fact, Defendant argues that Lakeland found itself in a better position as its loan to the Bank of Scotland involved a lower interest rate. Plaintiffs point out, however, that Avalon caused Lakeland to take out a secured loan with Bank of Scotland in order to pay off an unsecured loan owed to Defendant. Because the burden to show good faith in an insider trade lies with the insider, Plaintiffs' Complaint provides enough factual allegations to survive Defendant's Motion to Dismiss.

### 3. Breach of Fiduciary Duties Owed to Lakeland's Creditors

In their briefs and at oral argument, the parties debate the viability of claims based on a breach of duty to the creditors. Because no such allegation can be found in the complaint as it is currently pled, the Court concludes that such claims are not at issue in this lawsuit. Plaintiffs may move for this Court to grant Plaintiffs leave to amend pursuant to Federal Rule of Civil Procedure 15(a). Under Rule 15(a), leave to amend "shall be given freely when justice so requires." *Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*, 559 F.3d 772, 782 (8th Cir.2009) (citing Fed.R.Civ.P. 15(a)). Until then, the Court will only consider Plaintiffs claims as stated in their Complaint.

### D. Plaintiffs' Unjust Enrichment Claim Count IX

 Finally, Defendant claims that Count IX should be dismissed because Plaintiffs have failed to state a claim for unjust enrichment. To state a claim for unjust enrichment in Minnesota, "the claimant must show that another party knowingly received something of value to which he was not entitled, and that the circumstances are such that it would be unjust for that person to retain the benefit." *Schumacher v. Schumacher*, 627 N.W.2d 725, 729 (Minn.Ct.App.2001). However, "[i]t is well settled in Minnesota that one may not seek a remedy in equity when there is an adequate remedy at law." *Southtown Plumbing, Inc. v. Har–Ned Lumber Co.*, 493 N.W.2d 137, 140 (Minn. Ct.App.1992) (citations omitted). Consequently, relief under an unjust enrichment theory is unavailable when there is an adequate legal or statutory remedy. *Id.*

Minnesota law prevents Plaintiffs from linking their unjust enrichment claim to Counts IV, V, and VI because statutory standards for recovery already exist. Nonetheless, Plaintiffs' claims involving breach of fiduciary duties are independent of statutory law and therefore provide support for an unjust enrichment claim. In Count IX, Plaintiffs allege that "[t]he benefits that Avalon received was the product of an unlawful act committed by Avalon." As discussed above, the Complaint pleads sufficient factual allegations to make a case for the breach of a fiduciary duty owed to Lakeland thereby causing an unlawful transfer of debt and equity. As a result, Plaintiffs' Count IX unjust enrichment claim may proceed.

## IV. CONCLUSION

Although the Supreme Court's decisions in *Twombly* and *Iqbal* bolstered pleading requirements, they did not change the procedural landscape from notice to fact pleading. In this case, Plaintiffs pleaded sufficient factual matter to state plausible claims to relief. Accordingly, **IT IS HEREBY ORDERED** that:

1. Defendants Motion to Dismiss [Docket No. 8] is DENIED; and

2. Pursuant to Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss, the Court accepts Plaintiffs'

3. voluntary dismissal of Counts I, II, and III of the Complaint.